Leo A. Ryan, Administrator of Estate of Chauncey Esch, Deceased, Appellant, v. Chicago and Northwestern Railway Company, Appellee.

**Gen. No. 42,012.**

66

Heard in the first division of this court for the first district at the October term, 1941. Opinion filed June 1, 1942.

RYAN, CONDON & LIVINGSTON, of Chicago, for appellant; JOHN M. TUOHY, of Chicago, of counsel.

NELSON J. WILCOX and I. C. BELDEN, both of Chicago, for appellee.

MR. JUSTICE MATCHETT delivered the opinion of the court.

Plaintiff administrator sued for damages under the statute because of alleged negligence of the defendant railway, through which the decedent lost his life. The complaint averred that defendant, on January 21, 1938, was in possession and control and was operating a steam railroad system on a right-of-way in Oak Park in Cook county, Illinois; that plaintiff's decedent was a police officer employed by the village of Oak Park and a few moments before the occurrence complained of, in pursuance of his duties, apprehended a prisoner he had detected in the commission of a crime and placed him under arrest upon defendant's right-of-way, and was walking with the prisoner in an easterly direction along a portion of defendant's premises used by defendant in boarding and discharging passengers; that while in the exercise of due care, the train of defendant struck him, causing injuries from which he died.

The original complaint described negligence of the defendant, which it averred was wilful and wanton.

The complaint was afterwards amended, and defendant answered admitting possession, control and

operation of the steam railroad system at the time and place in question; that the decedent was a police officer and was struck and killed by a locomotive of defendant, but denied decedent was in the exercise of ordinary care or the defendant guilty of any negligence. By leave of court plaintiff afterwards filed an additional count in which he set up the same facts but alleged negligence without averring that it was wanton or wilful.

The cause was tried before a jury. At the conclusion of plaintiff's evidence the court, on motion of defendant, instructed a verdict for defendant and entered judgment on it, from which plaintiff appeals.

The question for decision is whether the evidence (giving to plaintiff the benefit of all facts proved and all just inferences therefrom) presented an issue of fact which should have been submitted to the jury. *Pollard v. Broadway Central Hotel Corp.*, 353 Ill. 312; *Blumb v. Getz*, 366 Ill. 273, and *Emge v. Illinois Cent. R. Co.*, 297 Ill. App. 344.

Before ruling on the motion to direct a verdict the court struck certain testimony given by Loyal Wilcox as to the customary use the defendant made of the space on which deceased walked when hit. Two exhibits (pictures intended to illustrate this testimony) were not admitted in evidence. Defendant states it has no objection to treating this stricken testimony and these two exhibits as if in evidence. So considered, there was evidence from which the jury might reasonably have inferred the following facts.

The accident in which Esch, the deceased, lost his life occurred about 6:30 p.m., January 21, 1938, on the right-of-way of defendant in Oak Park, near the intersection of Marion street and North Boulevard. Marion street runs north and south; North Boulevard east and west. Defendant's tracks. at the place where the accident occurred rests on an elevation about 15 feet above the ground. Steps lead from the ground below to the station and platform connected with it,

which are located on the north side of the elevation near the intersection and on defendant's right-of-way. The west boundary of the platform of the station was at a point where Marion street passed under the railroad tracks. There was an underpass on the street running under the tracks. The underpass was about 66 feet wide, designed for vehicular and pedestrian traffic. .At the west end of the platform was an iron railing extending the entire width of the platform and west of the platform over the top of the underpass to a point west of where the accident occurred. At this place five tracks of defendant ran generally in an east and west direction over the right-of-way. The north track was used for eastbound traffic. Between the north rail of the most northerly track and the guard rail at the top of and on the north side of the elevated structure was a space of ground about 6 feet wide.

Decedent was an Oak Park policeman on duty at this intersection. A culprit from Sterling snatched the purse of a lady on the street and ran. She cried out; others cried out, and the culprit ran. Esch pursued him. He ran up the steps leading to defendant's depot, then back of the tracks toward the west, with the officer in hot pursuit. The culprit ran southwesterly about 400 feet west of the west line of the platform and passed from the north to the south of the five tracks. The officer fired his revolver, called the fugitive to halt, which he did, and the officer arrested him. The officer then started to walk his prisoner north across the tracks. It was noticed the culprit had lost his hat. They went back together and got it. They then walked north to the space of ground between the north rail of the north track and the guard rail on the elevation, then walked east, side by side, the prisoner near the guard rail, the officer near to the north rail of the north track. At a point about 107 feet west of the west edge of the station platform the officer, Esch, was struck by the rear or lead car of de-

fendant's train of empty cars, which was backing up from Elmhurst (a village about 16 miles west) to defendant's yards at California avenue in Chicago, about 6 miles east of Oak Park. The evidence tends to show the train was backing at a speed of about 30 miles per hour. The train consisted of five empty coaches. Decedent was struck by the step on the northeast step of the lead coach and thrown under the train, which came to a stop 440 feet from the point of impact. Decedent's legs were severed from the body, the body itself thrown north on the north rail of the eastbound track. The body was found impinged under the engine at a point directly beneath the cab. Deceased was taken to the hospital, where he died that night.

This train was in charge of defendant's brakeman, Frank Kane, who lived in West Chicago. He was in the front coach which was a roller bearing type coach and would seat about 90 passengers. The vestibule of this coach was a regular coach platform, and on the end of it was a tail gate and tailboard. The train was not scheduled to make any stops on this trip. A rule of the defendant company required the brakeman to be on the rear platform of the lead car. This was necessary in case it was desired to stop the train. The purpose of stopping it would be in case of an emergency—if anything was on the track, any train ahead, any "signal" against him. Kane was the person on whom the duty rested to stop the train in case of emergency. The brakes were operated by a tail hose, a long rubber hose with a valve on the end of it. The valve was opened to set the air and set the brakes by a metal lever which the brakeman held in his hand. The only operation required to set the brakes was to push the lever back. There was an air whistle on the hose which operated from the same valve and from which there were two openings. When the valve opened the whistle blew. To sound the

whistle it was only necessary for the brakeman to place his finger on the lever.

The trainman or brakeman (Kane) was called by plaintiff and testified. He gave some evidence in conflict with the facts as above stated and facts testified to by other witnesses. He said he was standing in the center of the vestibule, two and one half or three feet back of the opening; that he was holding the lever in his hand at the time of the accident, and that Esch the police officer came right across in front of the train and was struck by the step on the northeast corner of the train.

The accident was seen by an unusual number of witnesses, persons who, after the hue and cry, were watching the pursuit by the officer. Several of these testified there was no brakeman on the rear end of the platform of the coach, where the air hose, etc., were located; that no whistle was blown, as the train approached the depot, no warning of any kind given prior to the accident; that there were no lights in any of the coaches and no headlight burning on the lead coach. From these and the further fact that the train ran 440 feet after hitting the decedent before it came to a stop, and 120 feet before the application of the brakes was made, it is argued the brakeman was not in his usual position where he could have a lookout for persons in danger and warn them, but was inside the coach some distance from his proper position until after the deceased was struck.

Plaintiff contends the evidence being thus, it should have been submitted to the jury not only on the question of whether defendant was guilty of any negligence, but also on the issue of whether the negligence was wilful and wanton.

The trial court was of the opinion that under the evidence the deceased, Esch, was at the most a mere licensee on defendant's right-of-way, and that their relationship was such that the only duty of the defend-

ant railroad company was not to injure him wantonly or wilfully. The trial judge was persuaded to this view by two cases which are relied on in defendant's brief. These are *Gibson v. Leonard*, 143 Ill. 182, 192, and *Casey v. Adams*, 234 Ill. 350, 355, 356. After a careful consideration of both cases this court is of the opinion that neither was applicable.

In the *Gibson* case, Gibson was a member of the fire insurance patrol and responded to an alarm of fire at a building on west Lake street in Chicago on Leonard's premises. He was directed with others to go to the basement, and for that purpose got on an elevator and was let down by means of certain ropes. The rope which held the counterweight broke and the elevator fell a distance of about 16 feet to the bottom of the basement. One of Gibson's legs was injured so badly that it had to be amputated. He sued Leonard the owner. The court held he was a mere licensee and could not recover, that defendant was not obligated to keep its premises in reasonable condition for his benefit.

In the *Casey v. Adams* case an administrator sued Adams to recover damages under the statute for alleged negligence resulting in the death of his decedent. At the close of the evidence for plaintiff the court directed a verdict of not guilty. Judgment was entered for defendant and plaintiff sued out a writ of error to this court. The judgment was affirmed, Judge BAKER dissenting, 137 Ill. App. 404. The case went to the Supreme Court by certificate of importance. The decedent was one of a number of police officers detailed during a strike to protect property carried by various common carriers in the city of Chicago, at request of the carriers. On the day of the accident a tenant in the building of defendant engaged an express company to transport goods of the tenant from the building. The express wagon came to the building for the merchandise and was driven into an alley and

backed up to an opening leading into an elevator shaft. The deceased had been ordered by his superior officer to ride on and remain with the wagon to protect the property and employees of the company and the goods carried by the wagon from strikers. There was an elevator some distance above the opening, coming down loaded with goods to be taken away. It was a dark, cloudy day, and the wagon was a large covered one, open only in front and rear. Immediately after it stopped the deceased, who was riding inside the wagon, stepped sideways and a little backward on the tailboard of the wagon, and then apparently stepped upon the bottom sill of the doorway or opening and disappeared into the elevator shaft below, receiving injuries from which he died. The Supreme Court said that if he went into the building as a matter of mere convenience he was a trespasser; if he stepped into the building that he might better perform his duties as a police officer he was licensed to do so by the law itself, but that as a mere licensee the defendant would owe him no duty except to refrain from inflicting a wilful or wanton injury. The judgment was affirmed.

Both cases are distinguished from this instant case in the fact that the alleged negligence in each had to do solely and alone with the actual condition of the premises, by reason of which the injury occurred, while here the negligence alleged is that which came about by the active operation of defendant's train of cars by a person placed in charge of the train by defendant.

In Professor Bohlen's "Studies in the Law of Torts" the duty of a land owner toward those entering his premises of their own right has been given careful consideration in Division III, pp. 156–201. In it he analyzes the case of *Meiers v. Fred Koch Brewery*, 229 N. Y. 10, 127 N. E. 491, where a bare majority of the court of appeals affirmed a judgment for plaintiff. Meiers, a fireman who responded to a call to put

out a fire that was burning defendant's barn, while on his way by the usual path fell into an unguarded coal hole and was injured. Professor Bohlen points out that decision limited liability to persons rightfully using the approaches prepared by the owner for access to his property. He says: (p. 161) "The numerous dicta and the few cases which deny recovery to a fireman, policeman or other public officer, who in the performance of his duty is injured by the bad condition of premises which as such public officer he has the right to enter, proceed upon the accepted American formula. Even though the owner had actually invited the visit of such an officer, even though his services are needed for the owner's protection, yet since the right is based on general public necessity and is not dependent on the owner's will (and would exist notwithstanding his most emphatic protest, if there was need of the visit, and, would exist even though the visit was of no benefit to the owner), it was correctly held that such consent as was given, and such benefit as in fact there was to the owner added nothing to a right perfect without them, and that therefore such officer was not an invitee. But it seems odd that once having so held, the courts should have regarded the officer as a mere licensee, for a license is as much creature of consent as an invitation, the only difference being in the owner's interest or lack of interest in the visit.

"But that a public officer is not an actual licensee does not solve the problem. The question remains whether, though he is not an actual licensee, there is not authority and reason for an obligation in the landowner broad enough to include him under such circumstances as those in the recent New York case."

The author goes on to show that the decisions as to the liability in such cases group themselves into two classes; first, those in which the injuries are caused by the owner's acts, and, second, those which are caused by the condition of his premises. He points

out that the rule that the only duty of a land owner to a trespasser or a licensee was not to wilfully or wantonly injure him arose from the feudal conception that the owner was sovereign within his own boundaries and as such might do what he pleased on or within his own domain. The King's law stopped at the boundary of the owner's sovereign territory except in felonies and in trespass actions, which were originally punitive and extensions of appeals for felonies and violent misdemeanors. The whole history of the law on this subject shows a tendency to whittle away the rule and place limitations on it.

It may be well to notice the actual relationship which existed between this defendant and the deceased at the time he was injured. The deceased was an officer of the law. Division 6, paragraphs 654, 655, § 1 and § 2, Ill. Rev. Stat., ch. 38, p. 1197 [Jones Ill. Stats. Ann. 37.629, 37.630], makes it the duty of every such officer of any incorporated town or village, when any criminal offense is committed or attempted, to "forthwith apprehend the offender." Section 3 [Jones Ill. Stats. Ann. 37.631] provides that to that end every male person above the age of eighteen, when commanded by an officer to assist in arresting or securing the offender, shall obey such command. Section 6, paragraph 659 [Jones Ill. Stats. Ann. 37.634], provides that the arrest may be made at any time of the day or night. This statute merely states the general rule of law. See Restatement of the Law of Torts, § 204. "The privilege to make an arrest for a criminal offense carries with it the privilege to enter land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land, or if the captor reasonably believes him to be there."

It is clear, therefore that Esch in pursuing and capturing and returning his prisoner was not a trespasser. It is just as clear (it seems to us) that he was not a mere licensee. The owner did not give him per-

mission to go upon the right-of-way. He did not need a license from anyone to do that. The law not only gave him permission to go, it commanded him to do so. Employees of the railroad company would have no right to forbid him to do otherwise. If they had attempted to interfere with him in the performance of his duty, they would have been guilty of resisting an officer, or perhaps compounding a felony. The executive officers of the road could not have rightfully ordered Esch to get off the premises. He was on the right-of-way by a right as ancient and absolute as any known to the law. It was his duty (indeed, it was the duty of every other citizen) when the "hue and cry" was raised to assist in the pursuit and capture of the criminal. A rule of law which holds one thus upon the land of another as a mere licensee is like putting "new wine into old bottles." The complex and difficult questions of right arising out of our modern civilization cannot be decided by a worn out formula based on feudal customs which have passed away.

In Prosser on Torts (published last year) the author says, at page 628: "The courts have encountered considerable difficulty in dealing with public officers, firemen and the like, who come upon the land in the exercise of a legal privilege and the performance of a public duty. Such individuals do not fit very well into any of the more or less arbitrary categories which the law has established. They are not trespassers, since they are privileged to enter. The privilege is independent of any permission or license of the possessor, and there is no right to exclude them. . . .

"Some courts have gone so far as to say that there is no duty to a licensee other than to refrain from inflicting wilful or wanton injury upon him. As in the case of trespassers, however, an increasing regard for human safety has led to a retreat from this position. *It is now generally held that as to any active opera-*

*tions which the occupier carries on, there is an obliga-
tion to exercise reasonable care for the protection of
a licensee.*''

·The author cites Restatement of Torts, § 341, and adds: ''He must run his train, operate his machinery, or back his truck with due regard for the possibility that the permission given may have been accepted and the guest may be present. The obligation is higher than that owed to trespassers, because the possessor is required to look out for licensees before they are discovered. Reasonable care is all that is required, and ordinarily a proper warning will be sufficient. The licensee has no right to demand that the occupier change his method of conducting activities for his safety, and in the usual case, if he is fully informed as to what is going on, or it is obvious to him, he has all that he is entitled to expect, and assumes the risk thereafter.''

*Neice v. Chicago & A. R. Co.*, 254 Ill. 595, illustrates the tendency of the courts to limit this rule that the only duty of the land owner to a trespasser or licensee is not to wantonly injure him. The administrator sued under the statute and recovered judgment. The evidence showed decedent was on a station platform of the railway for the purpose of obtaining a ride on a freight train without paying for it and contrary to the rules of the company. While he was standing on the platform a freight train ran past at a speed of from 25 to 40 miles per hour, without any headlight and without ringing a bell or blowing a whistle. The end of the pilot beam struck Neice and threw him 25 feet, causing his death. The court held he was a trespasser and that if it had been a mere question of negligence on the part of those in charge of the train there could have been no recovery. The court said: ''To run a train in the night time over unlighted station grounds without a headlight, and without any warning by bell or whistle, along a platform where persons may rea-

sonably be expected to be, is evidence tending to prove a wanton and reckless disregard of the safety of such persons. In such a case it is not necessary that there should be specific knowledge of an individual on the track or platform or specific ill-will toward or an intention to injure an individual." The judgment was affirmed.

In the instant case, if, as the testimony tends to show, defendant's brakeman in charge of its train was not at his place of duty and ran the train without a headlight, and without warning by whistle or otherwise, upon approach to this station, then following the *Neice* case and assuming the deceased was a mere licensee, we hold plaintiff would be entitled to have submitted to the jury the question of whether defendant was wantonly negligent. However, we hold the decedent was neither trespasser nor mere licensee but was rightfully on defendant's right-of-way, when injured, upon business which required his presence there, and that defendant was obligated to the use of reasonable care not to injure him. There was evidence from which the jury could find the defendant was not in the exercise of due care. There was also the question of whether defendant under all the circumstances was negligent, but these questions were for the jury. It was error for the court to direct a verdict and enter judgment on it, and for that error the judgment is reversed and the cause remanded.

*Reversed and remanded.*

McSurely, P. J., and O'Connor, J., concur.