# HARRY ZUERCHER v. NORTHERN JOBBING COMPANY.[1]

## November 19, 1954.

## No. 36,169.

[1]Reported in 66 N. W. (2d) 892.

*Linus J. Hammond* and *Cummins, Cummins, Hammond & Ames,* for appellant.

*Norman E. Biorn,* for respondent.

MATSON, JUSTICE.

In an action for damages for personal injuries from inhalation of carbon monoxide gas on defendant's premises, defendant appeals

from an order denying its motion for judgment notwithstanding the verdict or a new trial.

Defendant, Northern Jobbing Company, a corporation, owns and occupies a six-story building in St. Paul in which it conducts a wholesale grocery business. The building is approximately 100 feet north to south and 220 feet east to west. A railroad spur for the loading and unloading of freight cars runs into the basement in a recessed channel or pit which is approximately three feet in depth and eleven feet wide and extends along the entire south wall from the track entrance on the east side of the building. The basement, which in its entirety covers an area approximately 110 feet wide by 217 feet long and has approximately a 13½-foot-high ceiling, is divided into two sections by a solid partition which runs from the south wall to the north wall. We are here concerned with the western section which covers an area of approximately 7,750 square feet. The solid partition which divides the basement has three entrances—a car door, a garage door, and a receiving door. Several windows are located in each of the north, south, and west outside walls. Each window is about six feet wide and consists of a three-pane upper and a lower sash about 18 or 20 inches high.

In April 1952 flood waters from the Mississippi River commenced to enter the basement particularly in the trackage channel. Defendant leased two gasoline-driven, one-cylinder centrifugal pumps to check the rising waters. In prior years the defendant had used these pumps and was familiar with their operation. The first of these pumps was procured on April 8 or 9 and the second on April 10. After installation in the southwestern part of the basement, both pumps were operated continuously 24 hours a day. The water was expelled upon the street through a hose which ran from each pump through a hole made by removing a pane in a lower window sash. No exhaust hoses were connected to the pump gasoline engines to remove the exhaust fumes from the building, and therefore the fumes were released and diffused in the basement.

On April 11, 1952, when the water in the trackage channel reached a depth of about two feet, defendant bought an O. C. D. sump pump,

operated by a six-cylinder automobile type engine, from the Little Canada Fire Department with the understanding that the members of this volunteer fire-fighting organization should deliver and install the pump in working order. About 2 p. m. on the same day, plaintiff, who was a member of such volunteer fire department, delivered the pump with the assistance of several other members. Upon arriving at defendant's premises, they, with the help of several of defendant's employees, wheeled the pump into the basement where, as expressly directed by an employee of the defendant, it was placed alongside the two one-cylinder pumps *which were then in operation.*

At the very time when the O. C. D. pump was being installed, other employees of the defendant were busily working in the basement removing merchandise to save it from water damage. The doors on the east side were closed most of the time. The windows, with the exception of the lower sash of the window used as an exit for the water hoses, were closed. No officer or employee of the defendant, or the plaintiff, said anything about opening the doors or additional windows in the basement to improve the ventilation. In the face of the rapidly rising water, the general atmosphere was one of excitement and emergency. Defendant's employees urged plaintiff to get the O. C. D. pump going. The two one-cylinder pumps were shut off and the O. C. D. pump was started but the latter developed mechanical trouble and was stopped after running for about five minutes. The two one-cylinder pumps were then started again. Plaintiff, in attempting to find the mechanical difficulty, ran the O. C. D. pump at intervals of two or three minutes at a time during the afternoon from 2:30 until 4 p. m. All told, the new pump was run for an aggregate period of about one-half hour. The two one-cylinder pumps were operating most of the remainder of the period.

At about 4:30 p. m., while still attempting to locate the mechanical difficulty, plaintiff became dizzy, felt a cramped feeling in his chest, became sick to his stomach, and dropped to his knees, but he did not lose consciousness. He was helped to his feet and led outside. Shortly afterward one of the other men, who had been working

on the pump with the plaintiff, also felt dizzy and went outside for fresh air and to escape the gas fumes. The latter was told by one of the defendant's employees that there was too much gas in the building, and both agreed that there was not enough ventilation in the basement. This conversation took place between 4 and 5 p. m. Shortly thereafter a fan was placed in the basement and some windows were opened by the defendant's employees who also had complained of gas fumes.

Plaintiff remained at the defendant's place of business until eight o'clock that evening. On his way home he was seized with a dizzy spell and a contraction in his chest. Prior to that time he had never had that type of pain. He called his doctor and was administered oxygen by two members of the Little Canada Fire Department that evening. Approximately one week later, on April 19, 1952, plaintiff suffered a heart attack and was taken to the hospital.

Although the plaintiff is now working at his normal means of livelihood, as a full-time janitor, his physical capacity has been substantially reduced. Prior to April 11, 1952, the plaintiff was in average good health and his family physician had found no heart difficulties. Plaintiff's ailment on April 19, 1952, was diagnosed as a myocardial infarction. Although there was a conflict in expert testimony at the trial, there was substantial expert testimony to show that the heart ailment was caused by the carbon monoxide gas inhaled by the plaintiff while he was attempting to place the O. C. D. pump into operation.

Defendant's appeal from the order denying its motion for judgment notwithstanding the verdict or a new trial presents issues of (1) negligence, (2) contributory negligence, (3) assumption of risk, and (4) proximate cause.

 In passing upon the issue of negligence we must first ascertain the legal status of the plaintiff as an entrant upon defendant's premises and the nature of defendant's duty toward a person of that status. Plaintiff was invited to enter upon defendant's premises to deliver and put the pump into operation in fulfillment of the busi-

ness transaction for the purchase of the pump. His general status was that of an invitee but more specifically he was a business visitor.

"A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them."[2]

Clearly, he who enters upon the business premises of another for the purpose of delivering goods purchased or sold is a business visitor within the meaning of the above definition.[3]

■■■ What was defendant's duty to the plaintiff as a business visitor? The owner or occupant of premises, although not an insurer of their safe condition, is bound to exercise ordinary or reasonable care *to keep* them in a safe condition for those who come upon them by his express or implied invitation,[4] and such duty of reasonable care encompasses the duty of making the premises safe as to dangerous conditions or activities upon the premises of which he knows, or of which he ought to have knowledge in the exercise of reasonable care.[5] Although the authorities generally agree that an owner or occupant of land who invites another on his premises owes that person an affirmative duty to protect him against dangers of which the landowner knows and those which with reasonable care the landowner ought to discover, there is no duty to warn a business visitor or an invitee against dangers which are known to the latter or which ought to be known and obvious to any person in the exercise of reasonable care.[6]

---

[2]Restatement, Torts, § 332; Yeager v. Chapman, 233 Minn. 1, 45 N. W. (2d) 776, 22 A. L. R. (2d) 1260; Prosser, Torts, p. 635.

[3]Folsom v. Hojny, 223 Minn. 223, 26 N. W. (2d) 219; Prosser, Torts, p. 636; Prosser, *Business Visitors and Invitees*, 26 Minn. L. Rev. 573, 605; see, 13 Dunnell, Dig. (3 ed.) § 6987.

[4]Henderson v. Bjork Monument Co. Inc. 222 Minn. 241, 24 N. W. (2d) 42; Schrader v. Kriesel, 232 Minn. 238, 45 N. W. (2d) 395; 13 Dunnell, Dig. (3 ed.) § 6984; Prosser, Torts, pp. 635 to 644.

[5]See, Prosser, Torts, pp. 635 to 644; Restatement, Torts, § 343, *comment d.*

[6]See, Blomberg v. Trupukka, 210 Minn. 523, 299 N. W. 11; Hutchison v. Hillside Cemetery Assn. 212 Minn. 242, 4 N. W. (2d) 81.

■ Defendant's affirmative duty to business visitors to use ordinary care to keep the premises safe as to dangerous conditions or activities thereon undoubtedly extends to the installation and operation of instrumentalities and appliances which cast off dangerous fumes, such as carbon monoxide from gasoline engines and gas stoves.[7] It is recognized that an owner or occupant who holds his land open to others for his own business purposes must possess and exercise a knowledge of the dangerous qualities of the place itself and the appliances provided thereon which is not required of his patrons. Restatement, Torts, § 343, *comment f*. Whether defendant has exercised ordinary care is to be ascertained by assuming that he knows those things which a reasonable man at that time and place ought to know even though he is in fact ignorant of them.

"* * * As a reasonable man, the actor is required to possess such scientific knowledge as is common among laymen at the time and in the community. * * * He is required, among other things, to know the poisonous qualities of many drugs, chemicals and gases and the explosive or inflammable qualities of many chemical compounds and the intoxicating quality of certain liquids." Restatement, Torts, § 290, *comment d*.

It has been held that, where knowledge is necessary to careful conduct in the installation and operation of an appliance discharging carbon monoxide gas, voluntary ignorance is equivalent to negligence. *Gobrecht v. Beckwith,* 82 N. H. 415, 135 A. 20,[8] 52 A. L. R. 858. In the average modern community of today, it is common knowledge among laymen that carbon monoxide gas from running gasoline engines is extremely dangerous. He who operates a gasoline engine within an enclosed area is charged with notice that carbon monoxide gas is being discharged by such engine and that

---

[7]Restatement, Torts, § 343, *comment f;* Gobrecht v. Beckwith, 82 N. H. 415, 135 A. 20, 52 A. L. R. 858.

[8]As to the affirmative duty to know or to obtain knowledge, see Pope v. Reading Co. 304 Pa. 326, 333, 156 A. 106, 109; Colonna Shipyard, Inc. v. Dunn, 151 Va. 740, 145 S. E. 342; Baumgartner v. Pennsylvania R. Co. 292 Pa. 106, 112, 140 A. 622, 625; 23 Minn. L. Rev. 654 to 666.

ordinary care on his part, for the safety of business visitors and others similarly situated,[9] requires that he take affirmative action for the expulsion of said gas to the outside atmosphere where it may be diffused without harm.

In applying these principles to the present case, the defendant could reasonably have been expected to know that the gasoline engines already installed, or to be installed, on his premises would emit dangerous exhaust fumes. There were no exhaust hoses on the gasoline engines and the fumes were permitted to diffuse into the basement where the ventilation was extremely poor. No windows, other than the one used as an exit for the water hoses, had been opened. The entrances to the basement were also closed a good share of the time.

■ The jury could reasonably find that the dangerous situation was not obvious to the plaintiff by reason of certain intervening factors. When he entered the basement he had no knowledge of how long the two one-cylinder pumps had already been in continuous operation prior to his arrival. He, therefore, could not know to what extent carbon monoxide was already in the air, if at all. The fact that the two one-cylinder pumps were already in operation might reasonably have misled plaintiff into a false sense of safety on the reasonable assumption that these pumps would not have been started, or permitted to continue to operate, without first providing proper ventilation. Such an assumption on his part would find added justification in the fact that defendant's employees were then actively working in the basement removing merchandise. It is also to be recalled that all activity was carried on in a disarming atmosphere of hurried excitement because of the danger of damage from the rapidly rising waters.

In the light of the circumstances which we have just related, we cannot conclude that plaintiff was guilty of contributory negligence as a matter of law, despite the fact that he was a volunteer fireman and had also at one time operated a gasoline station for a short time. Although knowledge of exposure to danger is a factor bearing upon

[9]See, 23 Minn. L. Rev. 655.

the issue of contributory negligence, it is not necessarily sufficient of itself to establish contributory negligence as a matter of law without regard to the surrounding circumstances.[10] We cannot say that plaintiff, as a member of the usual type of volunteer fire department and also as a former operator of a gasoline filling station, was possessed of such special knowledge over and above that of an ordinary layman that he could be said to have either deliberately or recklessly exposed himself to a known danger. It is doubtful whether he recognized the danger since he suddenly found himself in the confines of a large basement with which he was unfamiliar and in which gasoline engines were already running and defendant's employees were working as if no danger existed. He had no special knowledge of ventilation methods or requirements for a large basement. Under all these circumstances the issue of negligence and contributory negligence was for the jury, and its findings are sustained by the evidence.

■ Upon the record, the doctrine of assumption of risk has no application. What we have already said upon the issue of contributory negligence bars a conclusion that plaintiff as a matter of law had the required knowledge and appreciation of the danger to which he was exposed. Assumption of risk involves comprehension that a peril is to be encountered and a willingness to encounter it. It differs from contributory negligence, based on carelessness, by being an exercise of intelligent choice. Schrader v. Kriesel, 232 Minn. 238, 45 N. W. (2d) 395. Since the jury could reasonably find that plaintiff was not aware of the danger to which he was subjected, it follows that he could not as a matter of law have exercised an intelligent choice to assume the risk of carbon monoxide poison.

■ Although the medical testimony was conflicting as usual, there was ample expert opinion to sustain a finding of a causal connection between plaintiff's carbon monoxide poisoning on April 11 and the resulting myocardial infarction. It is true that one of the medical experts first testified that in his opinion the carbon monoxide

---

[10]See, Theisen v. Minnesota Power & Light Co. 200 Minn. 515, 274 N. W. 617; Schroepfer v. City of Sleepy Eye, 215 Minn. 525, 10 N. W. (2d) 398.

poisoning *may have been* a proximate cause of such infarction, and that he later changed his testimony by stating positively that he was of the opinion that plaintiff's heart condition was produced by the carbon monoxide poisoning. The fact that a medical expert in the course of a trial changes his opinion with respect to the origin or proximate cause of plaintiff's disability is not *of itself* a ground for excluding his testimony or holding it unworthy of any probative value as a matter of law, and its weight, despite such change, is for the jury. See, Kundiger v. Metropolitan L. Ins. Co. 218 Minn. 273, 279, 15 N. W. (2d) 487, 492.

■ Aside from the question of common-law negligence, the plaintiff pleaded the violation of a municipal ordinance which is a part of the building code of the city of St. Paul.[11] This ordinance provides that certain basements shall be properly and sufficiently ventilated. The ordinance was admitted into evidence over the objection of the defendant, and later was embodied in the charge given to the jury. The alleged error in the court's charge to the jury was not objected to by the defendant and neither was such error assigned in the notice of motion for a new trial. See, Rules 51 and 59.01(6) of Rules of Civil Procedure. Pursuant to Rule 51, an error in the court's charge to the jury with respect to fundamental law or controlling principle which is not reasonably brought to the court's attention before the jury retires to consider its verdict and which error is also not assigned in the motion for a new trial may not be considered for the first time on appeal, and the charge, despite such error, becomes the law of the case. See, Smith v. Otto Hendrickson Post 212, 241 Minn. 46, 62 N. W. (2d) 354; 1 Dunnell, Dig. (3 ed.) § 404; 2 Youngquist & Blacik, Minnesota Rules Practice, Rule 51, and 3 *Id.*, Rule 59.01(6), and cases therein cited.

The order of the trial court is affirmed.

Affirmed.

---

[11]Ordinance No. 7210, § 15-8, Building Code of City of St. Paul.