(Nos. 35466, 35721 Cons.—

GINO DINI *et al.,* Appellants, *vs.* IRVING NAIDITCH *et al.,*
Appellees.

*Opinion filed Sept. 30, 1960.—Rehearing denied Nov. 30, 1960.*

408

SCHAEFER, C.J., and KLINGBIEL and HOUSE, JJ., dissenting.

JAMES A. DOOLEY, of Chicago, for appellants.

ARTHUR ABRAHAM, and ROBERT L. BRODY, both of Chicago, for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This a combined appeal by plaintiff Elizabeth Dini from a summary judgment dismissing her action for loss of consortium, and by plaintiff Gino Dini and plaintiff Lillian M. Duller, as administratrix of the estate of Edward J. Duller, from a judgment notwithstanding the verdicts entered in their actions for the injury and death of city firemen, allegedly caused by defendants' negligence and statutory violations in the maintenance of their premises. The superior court of Cook County set aside jury verdicts awarding

damages of $235,000 for personal injuries sustained by fireman Gino Dini, and $20,000 for the wrongful death of fire captain Edward Duller, on the ground that there was no legal basis for liability.

Our jurisdiction to review the cause on this direct appeal having been determined on motion, we must now consider the two major issues presented by this appeal: First, whether landowners and operators are liable to city firemen for the negligent maintenance of their premises in violation of certain fire ordinances; and secondly, whether a wife is entitled to damages for loss of consortium due to the negligent injury of her husband.

The operative facts discernible from the controverted testimony are that since 1946 defendants Albert and Rae Naiditch have been the owners of a four-story brick building erected in 1896 at the intersection of Milwaukee Avenue and North Green Street in Chicago. Each floor contained about 6,000 square feet of space. Most of the ground floor was occupied by Naiditch for selling store and restaurant fixtures; the basement was used for storage for that business and for the boiler; and the second, third and fourth floors of the building were operated as the Green Mill Hotel. There were 27 rooms, most of which were single, on each of the three hotel floors, and five or six rooms on each floor had kitchens. These premises were occupied by some 84 persons. Access to the three hotel floors from the vestibule of the Green Street entrance was by means of a wooden stairway, approximately six feet wide, supported by stringers that were nailed to the walls rather than recessed.

Adjacent to the stairway landing on the second floor was an office maintained by defendant Kenneth Oda and Thomas Sato, who, as lessees of Naiditch since 1951, operated the hotel as partners at the time of the fire. Next to that office, and some 17 or 20 feet from the stairwell was a storage room in which, according to the uncontroverted

testimony, paint and benzene was kept, including a four or five gallon aluminum can of benzene at the time of the fire. There was also testimony that there were numerous paint cans, brushes and rags in the office, despite a provision in the lease that no naphtha, benzene or other enumerated flammable products were to be kept on the premises without the written permission of Naiditch.

The record respecting the condition of the premises prior to and at the time of the fire is extensive. Apparently there was no compliance with the lease provision that the lessee would spend an average of $1,500 annually for maintenance and improvement of the premises and give Naiditch monthly itemizations of such expenditures. Naiditch had his attorney write to Oda and Sato demanding that repairs be made, and later filed a lawsuit, which culminated with $1,500 put in escrow for repairs. Neither Naiditch nor Oda, however, admitted having any records whatsoever respecting the maintenance of the property. While the lease required Naiditch to inspect the hotel once a month, he admitted on trial that he had not made such regular inspections, and that he had not seen the hotel some six weeks prior to the fire, having been on vacation.

It also appears from the testimony of residents of the hotel that there were oil drums converted into open garbage cans in the hotel corridors, which were emptied only two or three times a week, that paper and other waste was piled in the corridors beside the cans, that the walls were cracked and rain had leaked through the roof into the fourth floor hallway, and that the janitor, Jimmy Sato, was "always drunk," but retained despite complaints. It also appears from the record that prior to the fire, defendants' attention had been called to nine separate violations of city ordinances within the building, although there is some controversy as to the findings of a former building inspector who testified for defendant.

With reference to the condition of the premises on the

night of the fire, one of the residents testified that two garbage cans on the first floor of the hotel were full and overflowing, and that paper was piled about a foot high on the floor. Another resident, who returned home about 11 P.M., said that three or four garbage cans in his section of the fourth floor were full, with paper piled around the cans so that he had to "cross around." According to firemen who fought the blaze, they could see rubbish in the hotel corridor when they reached the second floor of the building, as well as trash and litter on the stairs. Moreover, there were no fire doors, according to the testimony of the deputy fire marshal who was on the premises during the fire and made a minute inspection after the fire, and that of the chief building inspector, and of the division fire marshal who was also inside the building during the fire and directed the fighting of the blaze. Nor were there any fire extinguishers of any kind in the hotel, according to the original admission of Naiditch and the testimony of residents who had lived there for three or four years, and that of the police detective who examined the premises after the fire.

With reference to the occurrence, it appears that at about 12:50 A.M. on April 28, 1955, after the fire had apparently been burning for at least thirty-five minutes, a police officer on duty some blocks away was attracted by the flames. He drove to the scene, where he found the Green Mill Hotel burning, and he radioed a report. Within minutes fire equipment arrived, but the flames were then shooting through the hotel roof and people were hanging out of the windows yelling and screaming.

According to the fire battalion chief, the fire was located in the stairway at the Green Street entrance, blocking the exit. He therefore ordered an engine company up the inside of the stairway to cool the fire off in order to effect rescue operations. Fire captain Duller, and firemen Smith, Collins and Dini, who was carrying a hose on his shoulder, entered the building through the Green Street entrance, and

proceeded up the stairs to the second floor landing, where they could hear the roar of the fire above. Collins was sent for a smaller hose, and Dini was left on the landing to couple the smaller hose into a shut-off pipe, while Duller and Smith started on up to the third floor where they could see the fire raging above them. At that moment, and without any warning, the entire stairway collapsed and fell into a heap at the first floor level. Captain Duller was buried in the burning debris, and his body was not recovered until the following day. Smith, who escaped, testified that something hit him on the head and drove him through the stairs onto the area below. Dini was pinned in a pile of burning wood, but extricated himself with great difficulty, and made his way out in flames which he extinguished by jumping into a puddle of water at the curbing.

Dini was so severely burned that his recovery was in doubt for two months. He suffered third degree burns on his scalp, face, neck, chest, arms, left leg and knee. Both outer ears were almost completely burned off, as were his nose, lips and eyelids. He also suffered severe burns inside his mouth and throat, which not only made breathing difficult, and swallowing and eating impossible, but interfered with the administration of anesthesia. When the burned skin sloughed off, leaving raw areas, it was necessary, in order to prevent infection, to make some thirteen skin grafts from other areas of his body. That phase of his hospitalization treatment lasted until August 13, 1955; and from October 13, 1955, to February 25, 1959, Dini underwent some fifty-nine additional operations for skin grafting and for the reconstruction of eyelids, and ears, and the removal of scar tissue.

His injuries are permanent insofar as loss of motion and flexion in the affected members is concerned, and insofar as they affect his appearance. Moreover, since March 1956, except for periods of hospitalization, Dini has worked only approximately three hours a day in the Fire Preven-

tion Bureau operating a typewriter, with the resulting loss of income.

Captain Duller was 54 years of age at the time of his death in the fire. He had been married some 21 years, and left surviving a widow, an 18-year-old son, and a 16-year-old daughter.

On the basis of substantially the foregoing facts, the jury returned the verdicts for plaintiffs Dini and Duller, as hereinbefore noted, and the superior court entered judgment for defendants notwithstanding the verdict on the ground that there was no basis of liability, since the fire ordinances violated by defendants were not enacted for the benefit of firemen. Moreover, the court entered a summary judgment dismissing the complaint of Elizabeth Dini on the ground that a wife has no cause of action for loss of consortium resulting from the negligent injury of her husband.

In reviewing this cause, we shall consider first the claims of Gino Dini and administratrix Lillian Duller, which involve the issue of the landowners' liability to firemen for the negligent maintenance of the premises. We believe that this question, considered last by this court in 1892, should properly be re-examined in its entirety.

It must be recognized at the outset that the English common law, from which our law is derived, was part and parcel of a social system in which the landowners were the backbone, and that it was inevitable that in such a legal climate supreme importance would be attached to proprietary interests. (Bohlen, Fifty Years of Torts, 50 Harv. L. Rev. 725, *et seq.*) It was the feudal conception that the landowner was sovereign within his own boundaries that gave birth to the rule that the only duty a landowner owed a licensee was not to wilfully or wantonly injure him. (Bohlen, Studies in the Law of Torts, 156-206.) It was, then, hardly a "giant step" to give the label of "licensee" to a member of the fire department who, in an emergency, enters the premises in the discharge of his duty, and to

hold, as the early cases did, that the owner or occupant owed the fireman no greater duty than to refrain from infliction of wilful or intentional injury. 13 A.L.R. 641, 642; 141 A.L.R. 584, 586; *Gibson* v. *Leonard,* 143 Ill. 182.

However, the history of the law on the subject of landowners and "licensees" shows a tendency to whittle away a rule which no longer conforms to public opinion. As Bohlen points out, "Like so many cases in which a barbaric formula has been retained, its content has been so modified by interpretation as to remove much of its inhumanity." (50 Harv. L. Rev. 725, 735.) Thus, to avoid extending what has been deemed a "harsh rule" (*Hamilton* v. *Minneapolis Desk Mfg. Co.* (1899) 78 Minn. 3, 80 N.W. 693; *Mulcrone* v. *Wagner* (1942), 212 Minn. 478, 4 N.W.2d 97), courts have held that firemen were entitled to be warned of "hidden dangers" or "unusual hazards" known to the landowner or occupant. 55 A.L.R.2d 525, 529; *Shypulski* v. *Waldorf Paper Products Co.* (1951), 232 Minn. 394, 45 N.W.2d 549; *Jenkins* v. *37th St. Corp.* (1940) 284 N.Y. 397, 31 N.E.2d 503; *Schwab* v. *Rubel Corp.* (1941), 286 N.Y. 525, 37 N.E.2d 234; *Mason Tire & Rubber Co.* v. *Lansinger* (1923), 108 Ohio St. 377, 140 N.E. 770; Restatement of Torts, § 345.

Other courts have avoided the harsh rule by finding from slight variations of circumstances that the injured fireman was an "invitee" (*Clinkscales* v. *Mundkoski* (1938), 183 Okla. 12, 79 P.2d 562); or a "business visitor" to whom the landowner owed a duty of reasonable care to keep the premises safe. *Zuercher* v. *Northern Jobbing Co.* (1943), 243 Minn. 166, 66 N.W.2d 892.

Still other courts, as well as legal scholars, have forthrightly rejected the label of "licensee," with its concomitant set of rights and duties for firemen. *Meiers* v. *Fred Koch Brewery* (1920), 229 N.Y. 10, 127 N.E. 491; *Shypulski* v. *Waldorf Paper Products Co.* (1951), 232 Minn. 394, 45 N.W.2d 549; *Smith* v. *Twin State Gas & Elec. Co.*

(1928), 83 N.H. 439, 144 Atl. 57, 60; 35 Mich. L. Rev. 1157, 1158; Harper, Torts, 96 (1933); Prosser, 26 Minn L. Rev. 573; 6 DePaul L. Rev. 97 *et seq.;* 69 U. Pa. L. Rev. 142, 147.

In the *Meiers case* the court allowed a fireman to recover for injuries caused when he stepped into a hole while fighting a fire on defendant's premises. While the court did not clearly define the status of a fireman, it refused to categorize him as a "licensee." In a closely circumscribed opinion, the court allowed recovery to "one not a licensee entering business property as of right over a way prepared as a means of access for those entitled to enter, who is injured by the negligence of the owner in failing to keep that way in a reasonably safe condition for those using it as it was intended to be used."

The Minnesota court, in *Shypulski* v. *Waldorf Paper Products Co.* 232 Minn. 394, observed that since firemen have a unique status, it follows that the duties owed to them may properly be unique; and that same approach was followed by our Illinois Appellate Court in *Ryan* v. *Chicago and Northwestern Railway Co.* 315 Ill. App. 65, 75. After reviewing the status of public officers, including firemen, who come on the land in the exercise of a legal privilege, the Illinois court allowed damages for the death of a police officer while on defendant's right of way, caused by the negligent operation of defendant's trains, on the ground that the owner was obligated to use reasonable care not to injure the police officer.

In reviewing the law on this issue, we note further that this legal fiction that firemen are licensees to whom no duty of reasonable care is owed is without any logical foundation. (Harper, Torts, § 96; Prosser, 26 Minn. L. Rev. 573; 35 Mich. L. Rev. 1157.) It is highly illogical to say that a fireman who enters the premises quite independently of either invitation or consent *cannot be an invitee* because there has been no invitation, but *can be a licensee* even

though there has been no permission. The lack of logic is even more patent when we realize that the courts have not applied the term "licensee" to other types of public employees required to come on another's premises in the performance of their duties, and to whom the duty of reasonable care is owed. If benefit to the landowner is the decisive factor, it is difficult to perceive why a fireman is not entitled to that duty of care, or how the landowner derives a greater benefit from the visit of other public officials, such as postmen, water meter readers and revenue inspectors, than from the fireman who comes to prevent the destruction of his property. 35 Mich. L. Rev. 1161.

Consequently, it is our opinion that since the common-law rule labelling firemen as licensees is but an illogical anachronism, originating in a vastly different social order, and pock-marked by judicial refinements, it should not be perpetuated in the name of "stare decisis." That doctrine does not confine our courts to the "Calf Path," nor to any rule currently enjoying a numerical superiority of adherents. "Stare decisis" ought not to be the excuse for decision where reason is lacking. (Dissent, *Mulcrone* v. *Wagner* (1942), 212 Minn. 478, 4 N.W.2d 97, 100.) As aptly stated by Lord Goddard in *Best* v. *Samuel Fox & Co.* (1952) Appeal cases, 716, 731, "English law is free neither of some anomalies, nor of everything illogical, but this is no reason for extending them."

Inasmuch as firemen obviously confer on landowners economic and other benefits which are a recognized basis for imposing the common-law duty of reasonable care (Restatement, Torts, § 343a; Harper, Torts, § 96; Prosser, 26 Minn. L. Rev. 573, 574; 35 Mich. L. Rev. 1161), we would agree with the court in the *Meiers case,* and with its adherents, that an action should lie against a landowner for failure to exercise reasonable care in the maintenance of his property resulting in the injury or death of a fireman

rightfully on the premises, fighting the fire at a place where he might reasonably be expected to be.

This interpretation does not run counter to any imposing body of precedent in this jurisdiction. As hereinbefore noted, this court has only considered the problem once, and that was in 1892 in *Gibson* v. *Leonard,* 143 Ill. 182. A careful reading of that case, however, indicates that the court did not analyze the common-law status of firemen, but was concerned primarily with whether a volunteer member of a fire insurance patrol, injured by a defective elevator counterweight in the basement of a building, was entitled to the protection of a particular safety ordinance. Nevertheless, for the clarification of the law, insofar as any language contained therein might be inconsistent with our interpretation of the common law in this case, it must be deemed to be overruled, along with any Appellate Court cases following the archaic licensee concept. *Velluz* v. *East St. Louis Light & Power Co.* 210 Ill. App. 565; *Thrift* v. *Vandalia Railroad Co.* 145 Ill. App. 414.

In the instant case, from the evidence previously noted that defendants failed to provide fire doors or fire extinguishers, permitted the accumulation of trash and litter in the corridors, and had benzene stored in close proximity to the inadequately constructed wooden stairway where the fire was located, the jury could have found that defendants failed to keep the premises in a reasonably safe condition and that the hazard of fire, and loss of life fighting it, was reasonably foreseeable. Hence, since there was legal basis of liability in this case, it was error to set aside the jury verdict and enter judgment notwithstanding the verdict.

Plaintiffs have alleged, as a second basis of liability, defendants' violation of certain safety ordinances. We have recognized the rule that the violation of a statute or ordinance designed for the protection of human life or property is *prima facie* evidence of negligence, and that the party

injured thereby has a cause of action, provided he comes within the purview of the particular ordinance or statute, and the injury has a direct and proximate connection with the violation. *Ney* v. *Yellow Cab Co.* 2 Ill.2d 74, 78-79; *Bandosz* v. *Daigger & Co.* 255 Ill. App. 494 (1930).

In determining whether the violation of safety ordinances gives an injured fireman a right of action against the guilty party, we find no unanimity in the case law. Apparently the crucial question in each case is whether it was intended that a fireman should come within the scope of the protection afforded by the statute or ordinance. 141 A.L.R. 584, 592.

Plaintiffs have called our attention to defendants' violation of certain provisions of the municipal code of Chicago requiring, for structures such as the Green Mill Hotel, enclosed stairwells (sec. 62—3.2); fire doors (63—3.6); fire extinguishers (64—4.1); and specifying that oil rags and waste shall be kept during the day in approved waste cans of heavy galvanized iron with self-closing covers, and shall be removed at night, and that rubbish shall not be allowed to accumulate in any part of any building (90—25). These ordinances further provide that, "It shall be unlawful to continue the use of or occupy any structure or place which does not comply with these provisions of this code *which are intended to prevent a disastrous fire or loss of life in case of fire,* until the changes, alterations, repairs or requirements found necessary to place the building in a safe condition have been made." (Sec. 90—3.) (Italics ours.)

Defendants, however, argue that firemen are not within the purview of these ordinances, and that, therefore, plaintiffs cannot predicate liability thereon. In support of that contention, defendants cite the aforementioned *Gibson case,* 143 Ill. 182. Recovery was denied in that case on the ground that the ordinance on which the fireman based his claim specified that it was designed to insure against injury to a specified class—employees of the building; hence, the

court reasoned that a volunteer fireman was not within that class for whose protection the ordinance was passed. The court distinguished the leading Massachusetts case of *Parker* v. *Barnard,* (1882) 135 Mass. 116, also cited by plaintiffs herein, on the ground that recovery by the injured policeman in that case was predicated on the landowners' violation of a safety statute respecting elevator shafts, which was general in its terms, and stated at page 195: "But here, in section 1074 of the ordinances of Chicago, *instead of general language, such as was used in the statute considered in Parker* v. *Barnard,* is found language which shows, in express terms, that the ordinance was intended only for the protection and benefit of employees in factories, workshops, and other places or structures where machinery is employed." (Italics ours.)

In the light of that precise statement in the *Gibson case,* differentiating it, in effect, from the case at bar where the safety ordinance is general in its terms and has the avowed purpose of preventing loss of life in case of fire, regardless of whose life it may be, we can hardly find the *Gibson case* to be a determinative precedent for the denial of this action. On the contrary, the entire implication of that case is that the ordinances herein, being general in terms, might properly include firemen within their protection.

Such an interpretation, moreover, would be consistent with the case law, both in Illinois and in other States. (*Bandosz* v. *Daigger & Co.* 255 Ill. App. 494; 141 A.L.R. 584, 592, and cases cited.) Thus, in *Drake* v. *Fenton* (1912), 237 Pa. 8, 85 Atl. 14, where the injured fireman was allowed to recover from a landowner who violated a statute requiring elevator shafts to be kept closed, the Pennsylvania court stated at page 12, "It [the Act of 1903] is not restricted to a specific class but is general in its terms, and it is a reasonable construction to hold that it was passed for the benefit of all persons lawfully on the premises." Similarly, in *Maloney* v. *Hearst Hotels Corp.* (1937), 274

N.Y. 106, 8 N.E.2d 296, the court stated at page 297, "* * * we have in this case a direct violation of ordinances which were enacted for the benefit of firemen as well as guests in the hotels; at least firemen entering into the premises had a right to assume that the law in this particular had been complied with." (See also *Taylor* v. *Palmetto Theatre Co.* (1943), 204 S.C. 1, 28 S.E.2d 538; *Racine* v. *Morris* (1911), 201 N.Y. 240, 94 N.E. 864, 866; *Carlock* v. *Westchester Lighting Co.* (1935), 268 N.Y. 345, 197 N.E. 306, 308.) In contrast, where the firemen's claims were rejected, the statutes or ordinances on which the claims were predicated were found to be expressly for the protection of "employees" (*Gibson* v. *Leonard,* 143 Ill. 182; *Hamilton* v. *Minneapolis Desk Mfg. Co.* 78 Minn. 3, 80 N.W. 693; *Kelly* v. *Muhs,* 71 N.J.L. 358, 59 Atl. 23); or for persons lodged or residing on the premises. *Aldworth* v. *F. W. Woolworth Co.* (1936), 295 Mass. 344, 3 N.E.2d 1008.

In accordance with this approach our Appellate Court in *Bandosz* v. *Daigger & Co.* allowed recovery in a wrongful death action where a fireman was killed by the explosion of inflammable liquid stored in a basement in violation of an ordinance and statute. The statute provided, in substance, that it shall be unlawful to store benzene or any combustibles in such manner or *under such circumstances as will jeopardize life and property,* and the ordinances prohibited the storage of more than 10 gallons of benzol or ether in any building within a certain area. The court rejected the *Gibson case* as determinative, and relied instead on *Parker* v. *Barnard,* on the ground that "the ordinance and statute were general in their terms, and not limited in their operation to any particular class of persons." Consequently the court held that firemen were entitled to the protection of such laws, and recognized a claim based on their violation.

There is a similarity between the italicized general lan-

guage of the statute involved in the *Bandosz case,* and the ordinances herein, which are intended "to prevent a disastrous fire or loss of life in case of fire." This analogy is not marred by defendants' attempt to distinguish that case and the others allowing such claims on the ground that the statutes in those cases related to explosives or combustible materials, whereas the safety ordinances herein deal only with the maintenance of the premises. The cases, however, warrant no such refinement. The criterion they impose is based not upon the subject matter of the safety statutes, but rather upon the intended coverage, *i.e.,* whether the law is general in its application, or restricted by its terms to a particular class. This is evident from the language in both the cases recognizing and those denying liability. In no case was the fireman's action rejected merely because the statute on which he based his claim did not deal with combustibles or extra-hazardous materials, as defendants suggest.

We must, therefore, recognize, as an additional basis of liability, defendants' alleged violations of the particular fire safety ordinances and that the owners, defendants Naiditch, can not avoid such liability on the ground that the premises were leased. (*City of Chicago* v. *Sheridan and Co.* 18 Ill. App. 2d 57 (1958); *Landgraf* v. *Kuh,* 188 Ill. 484.) We have already noted that there was some evidence from which the jury could reasonably find that defendants were in fact guilty of violating these ordinances, and that such violations proximately caused the injuries of plaintiff Dini and the death of Captain Duller. Therefore, it was reversible error for the trial court to enter judgment notwithstanding the verdict with respect to these claims.

In considering next the issue of whether plaintiff Elizabeth Dini may assert an action for loss of consortium due to the negligent injury of her husband, we note that this question has been considered in this jurisdiction in only a single Appellate Court case, decided in 1913 (*Patelski* v.

*Snyder,* 179 Ill. App. 24,) which the Federal court deemed declarative of Illinois law in the absence of a Supreme Court decision overruling it. (*Seymour* v. *Union News Co.* (1954), (7th cir.) 217 F.2d 168, 169.) In the *Patelski case,* our Appellate Court denied the action on the ground that it was neither recognized at common law prior to the act of 1874 (Ill. Rev. Stat. 1874, chap. 68, par. 1,) removing the civil disabilities of married women, nor specifically conferred by that act.

Therefore, inasmuch as this question is not overladen with Illinois precedents and is essentially one of first impression for this court, we shall review the origin of the common-law rule, examine its application by the courts of other jurisdictions and the reasons advanced for its retention or rejection.

The common-law rule adhered to in the *Patelski case* denying the wife an action for loss of consortium due to the negligent injury of her husband was promulgated at a period in history when all the wife's personal property, money and chattels of every description became her husband's upon marriage. She could neither contract, nor bring any action of any kind. Husband and wife were one, and "he was that one." (*Acuff* v. *Schmit* (1956), 248 Iowa 272, 78 N.W.2d 480, 484; *Montgomery* v. *Stephan* (1960), 359 Mich. 33, 101 N.W.2d 227, 230; 1 Blackstone's Commentaries 433-436.) Since the husband was entitled to his wife's services in the home, as he was to those of any servant in his employ, if he lost those services through the acts of another, that person had to respond in damages. (8 Holsworth, a History of English Law (2d ed. 1937), 427, 430.) He had a right of action for injury to her grounded on the theory that she was his servant. However, should the husband be injured, the wife, being a legal nonentity (1 Blackstone, Commentaries, 442,) could bring no action. A servant could hardly sue for the loss of services of the master. (3 Blackstone, Commentaries, 142, 143.)

As vividly explained in the *Montgomery case,* 101 N.W.2d at page 230: "This, then, is the soil in which the doctrine took root; the abject subservience of wife to husband, her legal nonexistence, her degraded position as a combination vessel, chattel and household drudge whose obedience might be enforced by personal chastisement."

Notwithstanding the obvious changes in the social, economic and legal status of married women during the ensuing centuries, these common-law rules allowing the husband a right of action for loss of consortium due to the negligent injury of his wife, but denying the wife a reciprocal action, were uniformly adhered to by the courts until 1950. (*Feneff* v. *New York Central & H.R.R. Co.* (1909), 203 Mass. 278, 89 N.E. 436; *Brown* v. *Kistleman* (1912), 177 Ind. 692, 98 N.E. 631; *Stout* v. *Kansas City Terminal Railway Co.* (1913), 172 Mo. App. 113, 157 S.W. 1019; *Bernhardt* v. *Perry* (1918), 276 Mo. 612, 208 S.W. 462; *Smith* v. *Nicholas Bldg. Co.* (1915), 93 Ohio St. 101, 112 N.E. 204; *Emerson* v. *Taylor* (1918), 133 Md. 192, 104 Atl. 538; *Tobiassen* v. *Polley* (1921), 96 N.J.L. 66, 114 Atl. 153; *Landwehr* v. *Barbas* (1934), 241 App. Div. 769, 270 N.Y.S. 534; *Maloy* v. *Foster* (1938), 169 Misc. 964, 8 N.Y.S.2d 608; *Sheard* v. *Oregon Electric Railway Co.* (1931), 137 Ore. 341, 2 P.2d 916; *Eschenbach* v. *Benjamin* (1935), 195 Minn. 378, 263 N.W. 154; *Giggey* v. *Gallagher Transportation Co.* (1937), 101 Colo. 258, 72 P.2d 1100; *Commercial Carriers* v. *Small* (1939), 277 Ky. 189, 126 S.W.2d 143; *Howard* v. *Verdigris Valley Electric Co-op.* (1949), 201 Okla. 504, 207 P.2d 784.) Apparently the only judicial deflection was a North Carolina decision that was subsequently overruled, (*Hipp* v. *E. I. Dupont de Nemours & Co.* (1921), 182 N.C. 9, 108 S.E. 318, overruled by *Hinnant* v. *Tidewater Power Co.* (1925), 189 N.C. 120, 126 S.E. 307), two dissenting opinions, (*Landwehr* v. *Barbas* (1934), 241 App. Div. 769, 270 N.Y.S. 534; *Bernhardt* v. *Perry* (1918), 276 Mo. 612, 208 S.W. 462), and one deci-

sion by a divided court (*McDade* v. *West*, (1949), 80 Ga. App. 481, 56 S.E.2d 299).

In 1950, however, the issue was re-evaluated by the Federal court in the well known *Hitaffer case.* (*Hitaffer* v. *Argonne Co.* 87 App. D.C. 57, 183 F.2d 811.) In that case, after the husband recovered under the Longshoreman's Compensation Act for negligently caused injuries, his wife asserted a claim for loss of her husband's aid, assistance, enjoyment and sexual intercourse, resulting from the injuries. The trial court, as in the instant case, granted defendant's motion for summary judgment, but, on appeal the Federal court for the District of Columbia held that the complaint stated a cause of action. After recognizing the unanimity of authority denying the wife recovery for such a loss, the court pierced what it called "the thin veil of reasoning employed to sustain the rule," and found no substantial rationale on which it could predicate a denial of the action. On the contrary, the court found that the husband and wife have equal rights in the marriage relation which should receive equal protection of the law. It could not justify denying the wife protection of an interest while allowing the husband protection of the same interest. Nor could it justify denying her action for the loss of consortium negligently incurred when she is allowed protection for the same interest in cases of intentional invasion. After buttressing the opinion with the critical comments of legal scholars and dissenting jurists condemning the common-law rule, the court stated at page 817 (F.2d.) : "The medieval concepts of the marriage relation to which other jurisdictions have reverted in order to reach the results which have been handed to us as evidence of the law have long since ceased to have any meaning."

The cases adjudicating this issue after the *Hitaffer* decision have been conflicting. The *ratio decidendi* of the *Hitaffer · case* itself has been circumscribed by the court which decided it, so that no right of action for loss of con-

sortium may be asserted by the wife where the husband's injuries are compensable under a workmen's compensation act, in view of the exclusiveness of that remedy. *Smither and Co.* v. *Coles,* (D.C. cir.) 242 F.2d 220; *Aubrey* v. *United States,* (D.C. cir.) 254 F.2d 768; to the same effect, *Ellis* v. *Fallert* (1957), 209 Ore. 406, 307 P.2d 283; *Ash* v. *S. S. Mullen, Inc.* (1953), 43 Wash.2d 345, 261 P.2d 118.

Some courts have expressly rejected the rule of the *Hitaffer case,* and have adhered to the old doctrine denying the wife's action for loss of consortium in all cases where her husband has been negligently injured. *Ripley* v. *Ewell* (1952 Fla.), 61 So.2d 420; *LaEace* v. *Cincinnati, Newport & Covington Ry. Co.* (1952 Ky.), 249 S.W.2d 534; *Larocca* v. *American Chain & Cable Co.* (1952), 23 N.J. Sup. 195, 92 A.2d 811; *Ash* v. *S. S. Mullen, Inc.* (1953), 42 Wash.2d 345, 261 P.2d 118; *Nelson* v. *A. M. Lockett & Co.* (1952), 206 Okla. 334, 243 P.2d 719; *Garrett* v. *Reno Oil Co.* (1954), (Tex. Cir. App.), 271 S.W.2d 764; *Jeune* v. *Webb Construction Co.* (1954), 77 Ariz. 226, 269 P.2d 723; *Franzen* v. *Zimmerman* (1953), 127 Colo. 381, 256 P.2d 897; *Nickel* v. *Hardware Mutual Casualty Co.* (1955), 269 Wis. 647, 70 N.W.2d 205; *Kronenbitter* v. *Washburn Wire Co.* (1958), 4 N.Y.2d 524, 176 N.Y.S.2d 354; *Deshotel* v. *Atchison, Topeka & Santa Fe Railroad Co.* (1958), 50 Cal.2d 664, 328 P.2d 449; *Coastal Tank Lines, Inc.* v. *Canoles* (1955), 207 Md. 37, 113 A.2d 82.

In some of these cases, however, one perceives that the adherence to the old rule was based on a compulsion to follow precedent rather than upon a deep conviction of the wisdom or applicability of the rule. *Larocca* v. *American Chain & Cable Co.; Ripley* v. *Ewell; Coastal Tank Lines, Inc.* v. *Canoles; Garrett* v. *Reno Oil Co.*

Other courts, however, have rejected the antiquated precedents, and have followed the *Hitaffer case* in recognizing the action. *Montgomery* v. *Stephan* (1960), 359 Mich.

33, 101 N.W.2d 227, 228; *Brown* v. *Georgia-Tennessee Coaches, Inc.* (1953), 88 Ga. App. 519, 77 S.E.2d 24; *Gordy* v. *Powell*, 95 Ga. App. 822, 99 S.E.2d 313; *Bailey* v. *Wilson* (1959), 100 Ga. App. 405, 111 S.E.2d 106; *Missouri Pacific Transportation Co.* v. *Miller* (1957), 227 Ark. 351, 299 S.W.2d 41; *Acuff* v. *Schmit* (1956), 248 Iowa 272, 78 N.W.2d 480; *Cooney* v. *Moomaw* (D.C. Neb. 1953), 109 F.Supp. 448; *Hoekstra* v. *Helgeland* (1959 S.D.), 98 N.W.2d 669; *Luther* v. *Maple* (C.C.A. Neb. 1958), 250 F.2d 916; *Hayes* v. *Swenson*, 14 (Pa.) D. & C.2d 708.

In view of this maze of conflicting precedents, it is not feasible to review the cases individually; we can only evaluate the reasons they reiterate in support of the recognition or denial of this action.

One of the principal and more popular grounds for denying the action is that the wife's injury is too remote and indirect to warrant protection. (*Giggey* v. *Gallagher Transport Co.* (1937), 101 Colo. 258, 72 P.2d 1100; *Feneff* v. *New York Central & Hudson River Co.* (1909), 203 Mass. 278, 89 N.E. 436; *Brown* v. *Kistleman* (1912), 177 Ind. 692, 98 N.E. 631; *Emerson* v. *Taylor* (1918), 133 Md. 192, 104 Atl. 538; *Hinnant* v. *Tidewater Power Co.* (1925) 189 N.C. 120, 126 S.E. 307.) It has been pointed out, however, that injury to the same interest of the husband has never been regarded too remote or indirect when the husband sues for his reciprocal loss. (*Montgomery* v. *Stephan*, 101 N.W.2d 227, at p. 231; *Acuff* v. *Schmit*, 78 N.W.2d 480, at p. 485; *Hitaffer* v. *Argonne Co.* 183 F.2d 811, at p. 814; 23 A.L.R.2d 1391.) This inconsistency would seem to detract from the cogency of this argument for denying the action.

Another reason frequently advanced in denying the right of action is that it may entail double recovery for the same injury, since the husband could recover in his action for his diminished ability to support his family. (*Deshotel* v.

*Atchison, Topeka & Santa Fe Railroad Co.* (1958), 50 Cal.2d 664, 328 P.2d 449; *Nickel* v. *Hardware Mutual Casualty Co.* (1955), 296 Wis. 647, 70 N.W.2d 205; *Giggey* v. *Gallagher Transport Co.* (1937), 101 Colo. 258, 72 P.2d 1100; *Stout* v. *Kansas City Terminal Railroad Co.* (1913), 172 Mo. App. 113, 157 S.W. 1019; *Bernhardt* v. *Perry* (1918), 276 Mo. 612, 208 S.W. 462.) This argument emphasizes only one element of consortium—the loss of support. Consortium, however, includes, in addition to material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualistic unity. (*Montgomery* v. *Stephan; Hitaffer* v. *Argonne Co.* at p. 814.) Consequently, in this action the wife is not suing for merely loss of support, but for other elements as well. Any conceivable double recovery, however, can be obviated by deducting from the computation of damages in the consortium action any compensation given her husband in his action for the impairment of his ability to support. (*Hitaffer* v. *Argonne Co.* at p. 815.) Hence, since the possibility of double recovery can be eliminated by this simple adjustment of damages, it should not constitute a basis for denying her action, which includes many elements which are in no way compensable in the husband's action. The "double recovery" bogey is merely a convenient cliche for denying the wife's action for loss of consortium.

The same emphasis on the material aspect of consortium and the arbitrary separation of the various elements of consortium is evident in the argument favored in some of the cases that since the wife has no right to her husband's services, she can have no action for loss of consortium, for the law does not allow recovery for sentimental services. (*Stout* v. *Kansas City Terminal Railroad Co.* (1913), 172 Mo. App. 113, 157 S.W. 1019; cases cited 23 A.L.R.2d 1395.) This argument not only gratuitously assumes that the concept of consortium is capable of dismemberment into material services and sentimental services—which is but a

theoretician's boast—but also overlooks the case law allowing the husband recovery for loss of consortium even where there is no loss of his wife's services, as well as the actions for criminal conversation and alienation of affections where damages are given for the so-called "sentimental services." (*Montgomery* v. *Stephan* at p. 232; *Hitaffer* v. *Argonne Co.* at p. 815.) Hence, the denial of the wife's action cannot logically be predicated on her inability to allege a loss of services according to medieval pleading practices.

It is further argued by courts which bar the action that the Married Women's Acts removing the common-law disabilities not only conferred no cause of action for loss of consortium on the wife, but must be construed as abolishing the husband's action, as an archaic legal concept. Inasmuch as we are not called upon to adjudicate the husband's claim, we need not consider that novel theory which would remedy the arbitrary denial of a cause of action to one partner by denying it also to the other one; nor can we predicate our interpretation of the common law on the supposition that one day a court will be able to equalize the situation by striking down the husband's action. Nor do we find that in Illinois the concept of "consortium" is ready for the discard pile. On the contrary, its vitality was reaffirmed in *Heck* v. *Schupp*, 394 Ill. 296, where we held unconstitutional a statute abolishing the action for alienation of affection, which involves this precise concept.

Other courts concede either expressly or impliedly the inadequacy of the common-law rule denying the wife an action for loss of consortium for the negligent injury of her husband, but insist that the remedy lies with the legislature. (*Deshotel* v. *Atchison, Topeka & Santa Fe Railroad Co.* 328 P.2d at p. 452; *Ripley* v. *Ewell*, 61 So.2d. 420; *Ash* v. *S. S. Mullen, Inc.* 261 P.2d 118; *Garrett* v. *Reno Oil Co.* 271 S.W.2d 764.) We disagree. Inasmuch as the obstacles to the wife's action were "judge invented," there is no conceivable reason why they cannot be "judge destroyed."

(*Montgomery* v. *Stephan,* 101 N.W.2d at p. 233.) We find no wisdom in abdicating to the legislature our essential function of re-evaluating common-law concepts in the light of present day realities. Nor do we find judicial sagacity in continually looking backward and parrotting the words and analyses of other courts so as to embalm for posterity the legal concepts of the past. On the contrary, we are mindful of the caveat of the Georgia court in *Brown* v. *Georgia-Tennessee Coaches, Inc.,* 88 Ga. App. 519, 77 S.E.2d 24, 32, in adjudicating this precise issue: "\* \* \* we do indeed have a 'charge to keep' but that charge is not to 'perpetuate error,' or to allow our reasoning or conscience to decay, or to turn deaf ears to new light and new life."

Consequently, we must agree with those jurists and critics who find that the reasons advanced in the cases for denying the wife's right of action for loss of consortium are without substance, and apparently have been added to support a predetermined conclusion dictated by history and the fear of extending liability. (Prosser, Torts, 948; 36 Cornell L. Q. 148; 64 Harv. L. Rev. 672; 23 A.L.R.2d 1391; *Hitaffer* v. *Argonne Co.* (D.C. 1950), 183 F.2d 811; *Acuff* v. *Schmit* (1956), 248 Iowa 272, 78 N.W.2d 480; *Montgomery* v. *Stephan* (1960), 359 Mich. 33, 101 N.W.2d 227; *Missouri Pacific Transportation Co.* v. *Miller* (1957), 227 Ark. 351, 299 S.W.2d 41.) Obviously the historical milieu in which the rule originated has been completely changed. Today a wife is no longer her husband's chattel, but stands as his equal in the eyes of the law. (*Acuff* v. *Schmit* at p. 485; *Brandt* v. *Keller,* 413 Ill. 503.) Therefore, precedents predicated on a medieval society are out of harmony with the conditions of modern society, and cannot in good conscience be deemed determinative. As Justice Cardozo aptly stated: "Social, political and legal reforms have changed the relations between the sexes and put woman and man upon a plane of equality. Decisions founded upon the assumption of a by-gone inequality are unrelated to present-

day realities, and ought not to be permitted to prescribe a rule of life." Cardozo, The Growth of the Law, pp. 105, 106.

Inasmuch as we prefer cogent reasoning to numerical superiority of authorities, we must follow those courts which hold that since the husband's right to the conjugal society of his wife is no greater than hers, an invasion of the wife's conjugal interest merits the same protection of the law as an invasion of the husband's conjugal interest. Furthermore, if the law protects the wife's conjugal interest from so-called intentional invasions, as in the alienation-of-affections cases, it cannot deny protection to the same interest where it has been injured by a negligent invasion. The same basic reason for granting relief exists in both cases, namely, the protection of the family, as the unit upon which our society is founded.

This approach, moreover, is in accord with the entire movement of the law toward protecting familial interests, and recognizing the changing obligations of its members. (*Johnson* v. *Luhman,* 330 Ill. App. 598; *Daily* v. *Parker* (7th cir.) 152 F.2d 174; *Brandt* v. *Keller,* 413 Ill. 503; *Amann* v. *Faidy,* 415 Ill. 422; *Saunders* v. *Schultz, ante,* p. 301.) Therefore, the complaint of plaintiff Elizabeth Dini seeking damages for the loss of consortium of her husband due to the injuries he sustained as a result of defendants' negligence, properly sets forth a basis of liability which the law must recognize. It was error for the trial court to enter summary judgment dismissing her complaint.

Although initially on this appeal defendants argued essentially the issues of liability, in their petition for rehearing they urge the propriety of a new trial. Defendants claim the verdict is not supported by the evidence, and refer to certain conflicts in the evidence. It was the province of the jury, however, to determine whether to give greater credence to the testimony of the defendant building owner and lessee, or to the testimony of the tenants and the fire and police department officials as to the condition of the

premises. As previously noted in this opinion, the evidence was overwhelming, even including some admissions of the defendant owner, that the premises were poorly maintained in violation of numerous fire ordinances, and that these conditions contributed to the intensity of the fire. Under those circumstances, it can hardly be seriously contended that the jury verdict was unsupported and against the manifest weight of the evidence so as to warrant a new trial.

Defendants argue further that a new trial should be granted because of the rejection of certain alleged building inspection reports made sometimes prior to the date of the fire. While the trial court probably erred in admitting only one of these exhibits, this ruling can hardly be deemed reversible error in view of the overwhelming testimony and exhibits revealing that the premises were a virtual fire hazard at the time of the fire. Moreover, those rejected inspection reports, made over a period of years, were of limited relevancy, and of questionable authenticity, since the person who prepared them did not testify, and the testimony of the building inspector who was called by defendants was thoroughly discredited on cross-examination. We find no justification, therefore, for authorizing a new trial merely on the basis of the improper rejection of these exhibits. We are of the opinion that the result would have been no different had the alleged trial errors not intervened.

In accordance with our analysis, the judgments entered in these claims should be reversed, with directions to adjudicate the complaint of plaintiff Elizabeth Dini, and to reinstate the jury verdicts in favor of plaintiffs Gino Dini and Lillian Duller.

*Reversed and remanded, with directions.*

Mr. CHIEF JUSTICE SCHAEFER, dissenting:

I do not agree with the conclusion of the majority upon the question of the right of Elizabeth Dini to recover for loss of consortium. When the opinion is analyzed, it ap-

pears that the principal reason advanced for allowing the wife to recover is that a comparable action in favor of the husband had developed at early common law. The opinion recites the familiar history of that development, and convincingly demonstrates that the social and economic conditions which gave rise to the husband's action have no relevance today. Nevertheless, apparently in order to achieve a kind of symmetry, the opinion establishes a matching right of action in the wife.

It is no more than an historical accident that the husband's common-law action survived the enactment of the Married Women's Act. That statute drastically changed the legal status of married women, and it is not surprising that it was narrowly construed in the early cases that considered the scope of recovery to be allowed to an injured married woman. The husband's action has survived in theory by acquiescence and not because it has withstood critical analysis. Only a few cases have referred to it, and almost all of the references have been by way of *dicta*. (*Blair* v. *Bloomington & Normal Railway, Electric & Heating Co.* 130 Ill. App. 400; *Chicago & Milwaukee Electric Railway Co.* v. *Krempel*, 116 Ill. App. 253; *Nixon* v. *Ludlam*, 50 Ill. App. 273; *City of Bloomington* v. *Annett*, 16 Ill. App. 199.) The husband's action for loss of consortium is not a vital part of our litigation processes today. In an attempt to give that action the appearance of current vitality the opinion cites *Heck* v. *Schupp*, 394 Ill. 296, decided in 1946, but that case did not involve a husband's action for loss of consortium due to a negligent injury. On the contrary, it involved the intentional tort of alienation of affections, and the distinction between liability for intentional conduct and liability for negligent conduct still survives in the law.

Subject to legislative action, it is the function of a common-law court, in a case like this, to fix the boundaries within which an injury to one person gives another a right

to recover damages. Each man's life is linked to the lives of many others, and an injury to one inevitably has its impact upon the lives of others. So far as I am aware, however, it has never been suggested that everyone who is adversely affected by an injury inflicted upon another should be allowed to recover his damages. It may be possible to argue that the relationship of husband and wife has distinctive characteristics that would justify a recovery which is denied to those who stand in other relationships to the injured person. But no such argument is advanced in the majority opinion, and it is hard to see why, for example, the wife of an injured man should be allowed a recovery that is denied to his children. If the boundaries of permissible recovery are to be extended, they should be extended upon a realistic appraisal of the factors involved, and not to achieve consistency with an outworn common-law cause of action. No such appraisal has been made. The reasoning of the majority would seem to permit an employee to recover for the damage he suffers by reason of his employer's injury or death, in order to match the common-law action *per quod servitium amisit*.

In addition to the substantive issues involved in establishing the new right of action, the procedural problem of the possibility of double recovery should be squarely faced. I do not understand the discussion of this problem in the majority opinion. It states: "Another reason frequently advanced in denying the right of action is that it may entail double recovery for the same injury, since the husband could recover in his action for his diminished ability to support his family. [Citations.] This argument emphasizes only one element of consortium—the loss of support. Consortium, however, includes, in addition to material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualistic unity. (*Montgomery* v. *Stephan; Hitaffer* v. *Argonne Co.* at p. 814.) Consequently, in this action the wife is not suing for merely loss of sup-

port, but for other elements as well. Any conceivable double recovery, however, can be obviated by deducting from the computation of damages in the consortium action any compensation given her husband in his action for the impairment of his ability to support. (*Hitaffer* v. *Argonne Co.* at p. 815.) Hence, since the possibility of double recovery can be eliminated by this simple adjustment of damages, it should not constitute a basis for denying her action, which includes many elements which are in no way compensable in the husband's action. The 'double recovery' bogey is merely a convenient cliche for denying the wife's action for loss of consortium."

The very next paragraph of the opinion, however, ridicules the possibility of dividing, or "dismembering" the "concept of consortium." It says: "The same emphasis on the material aspect of consortium and the arbitrary separation of the various elements of consortium is evident in the argument favored in some of the cases that since the wife has no right to her husband's services, she can have no action for loss of consortium, for the law does not allow recovery for sentimental services. (*Stout* v. *Kansas City Terminal Railroad Co.* (1913), 172 Mo. App. 113, 157 S.W. 1019; cases cited 23 A.L.R. 2d 1395.) This argument not only gratuitously assumes that the concept of consortium is capable of dismemberment into material services and sentimental services—which is but a theoretician's boast—but also overlooks the case law allowing the husband recovery for loss of consortium even where there is no loss of his wife's services, as well as the actions for criminal conversation and alienation of affections where damages are given for the so-called 'sentimental services.' (*Montgomery* v. *Stephan* at p. 232; *Hitaffer* v. *Argonne Co.* at p. 815.) Hence, the denial of the wife's action cannot logically be predicated on her inability to allege a loss of services according to medieval pleading practices."

Adjectives, adverbs and epithets can neither solve nor eliminate the problem. When two overlapping causes of action are made to grow where one has grown before, the possibility of double recovery is real. It cannot be obviated by the method suggested in the majority opinion, because there is no assurance that the wife's action will be tried first, or even that the two actions will be filed in the same court. A requirement of compulsory joinder of the two causes of action would help, but no such requirement exists.

I think that this court should refuse to sanction the new action, as other courts that squarely faced the substantive and procedural problems have done. *Kronenbitter* v. *Washburn Wire Co.* (1958), 4 N.Y.2d 524, 151 N.E.2d 898; *Deshotel* v. *Atchison, Topeka & Santa Fe Railroad Co.* (1958), 50 Cal. 2d 664, 328 P.2d 449; *Neuberg* v. *Bobowicz* 401 Pa. 146, 162 A.2d 601; *Snodgrass* v. *Cherry-Burrell Corp.* (N.H. 1960), 164 A.2d (Adv. Op.) 579.

On the issue of the liability of the owners of the building to Gino Dini and to the administratrix of the estate of Edward J. Duller, I think that the defendant's motion for a new trial should have been allowed. The majority concedes that it was error to exclude the reports of the inspection of the building, and attempts to minimize the error. But much of the testimony as to alleged violations of ordinances on the part of the owners of the building was quite unsatisfactory. The issue was a crucial one, and I do not believe that the serious question raised by the exclusion of this evidence should be sloughed off. I think, too, that the motion for a new trial should have been allowed because the plaintiff argued to the jury, without any support whatsoever in the evidence, that the owners of the building had themselves started the fire. This unwarranted argument was extremely prejudicial, and I do not see how the prejudice could be eliminated short of a new trial.

Mr. JUSTICE KLINGBIEL, also dissenting:

I wish to add my full accord with the views of Mr. Chief Justice Schaefer in his dissent on the consortium question.

I must also express my disagreement with the majority opinion on the matter of liability. Under our system of justice responsibility in these cases is based upon negligence, and the negligence must be a proximate cause of the injury. I agree with the court that negligence was shown in these cases, not because of the ordinance violations upon which the majority opinion lays so much stress, but because of the operative facts themselves.

I do not agree, however, with the apparently tacit conclusion that liability follows as a matter of course. The other requirement of negligence law—that the injuries be proximately caused by the negligence—also deserves attention. There is no doubt on this record that a jury could reasonably find the negligence was a proximate cause of the fire; and the defendants would be liable, of course, for any other damage or injury proximately caused thereby. But the very question in the case is whether the injuries in question were so caused. To stop after finding the mere existence of negligence, and then to announce liability with nothing more than the statement that the "violations proximately caused the injuries," is to decide a case by bare fiat.

It seems to me that the injuries sustained here could not be reasonably foreseen as a result of the mere accumulation of trash and the other conditions to which reference is made in the majority opinion. Most fires start, no doubt, from carelessness on the part of someone, but we can hardly predicate on such flimsy grounds a liability for every injury that would not have happened but for the fire. If a spectator should faint from the excitement, or suffer a heart attack from the shock of such a tragedy, there would be just as much basis for recovery as shown by the present

record. Such consequences, while possible of course, are much too remote to afforded grounds for liability.

A third objection should receive some mention, perhaps. The matters in which this court has jurisdiction on direct appeal are plainly stated in the statute, and they do not include personal injury cases. Unless procedural requirements of this nature are to become mere matters of conjecture on the part of the bar, opinions in cases which apparently fail to meet them, and which are nevertheless taken on the merits, should point out the grounds upon which direct appeal is authorized. I see none in the records of the present cases.

As to the substantive issues I would affirm the judgments of the superior court.

Mr. Justice House, also dissenting.