MARGARET COUNTRYMAN, Ex'r of Estate of Richard Countryman, Deceased, Plaintiff-Appellee and Cross-Appellant, v. THE COUNTY OF WINNEBAGO, Defendant-Appellant and Cross-Appellee.

Second District  No. 84—290

Opinion filed August 2, 1985.

Daniel Doyle, State's Attorney, of Rockford (Patrick J. Winn, Assistant State's Attorney, of counsel), for appellant.

Eugene E. Brassfield and Gary Kardell, both of Brassfield, Cowan & Howard, of Rockford, and Robert T. Chadwick, of Fearer & Nye, of Oregon, for appellee.

JUSTICE LINDBERG delivered the opinion of the court:

Margaret Countryman, executor of Richard Countryman's estate, brought a wrongful death action against Winnebago County in connection with her husband's death in the county's jail due the county's al-

leged negligence. The jury found for Margaret Countryman; found total damages amounted to $400,000; and reduced damages by 50% based upon Richard Countryman's contributory negligence. The county has appealed, and Margaret Countryman has cross-appealed from the judgment.

The county raises issues concerning whether, in a wrongful death action where loss of consortium damages were recoverable, evidence that decedent's wife saw him in bed with another woman was improperly excluded; the jury should have been instructed that any award of damages would be exempt from income taxes; mistrial should have been granted due to out-of-court remarks made by the trial judge in his capacity as chief judge which were reported in the local newspaper; the judgment finding the county guilty of negligence was against the manifest weight of the evidence; certain Federal court pleadings were admissible; and opinion testimony as to the statistical likelihood of accidental death of a person who abuses alcohol was admissible. Margaret Countryman raises a single issue concerning whether the jury was improperly instructed that an intoxicated person is held to the same standard of care as a sober person.

At about 10:30 p.m. the evening of May 13, 1981, Richard Countryman was involved in a traffic accident. He left the scene and was shortly thereafter arrested. The damage to his pickup truck was such that, when arrested, Mr. Countryman had to get out on the passenger side. He was charged with driving under the influence and leaving the scene of a property damage accident; however, because of possible injuries to the other driver, the latter charge was amended prior to his being taken to the jail to leaving the scene of a personal injury accident.

Mr. Countryman was taken to the Winnebago County Public Safety Building. At the entrance, Mr. Countryman fell and struck his head against a plasterboard wall, making an indentation or hole in the wall and briefly rendering him unconscious. He was helped to his feet and, while being led to a room where breathalyzer testing was to occur, he fell to his knees and urinated on the floor. He was again assisted to his feet and two breath tests were performed with readings of .15 and .19.

In the elevator which was taking him to the jail area of the building, Mr. Countryman again fell to his knees. He was helped to his feet and led to the booking desk after the elevator reached the third floor.

Once there, the traffic citations charging the defendant with the two aforementioned offenses were given to Deputy Lloyd Clark who, with Deputy Virginia Ritter, booked Mr. Countryman. Clark started to

fill out a medical history questionnaire, but did not complete it, during booking.

Deputy William Michau took Mr. Countryman to be fingerprinted and photographed and, during the 25 to 30 minutes they were together, heard Mr. Countryman complain of pain in his back on three separate occasions. On two of those occasions he also saw Mr. Countryman's midsection jerk. When returned to the booking area, Mr. Countryman had to be held by Clark to prevent his falling.

Mr. Countryman had sufficient money, the inventory search during his booking showed, to make bond. There was testimony that he was asked to telephone home and encouraged to make bond, but that he refused to do so. After his refusal, Richard Countryman was taken to a temporary holding cell. He was seen twice by the jail's night shift supervisor in the early morning hours of May 14, 1981: once at about 4:30 a.m. and again about 5:15 a.m. Breakfast was served in the temporary holding area at about 5:45 a.m., and the jailer serving it testified that Mr. Countryman's tray was empty when it was subsequently picked up.

Mr. Countryman was found slumped over the toilet in his cell with blood coming from his mouth at about 10 a.m. He was pronounced dead at about 10:20 a.m., May 14, 1981. An autopsy performed that afternoon indicated that he had bilaterally fractured ribs and a torn mesentery as a result of the traffic accident. The latter condition had resulted in internal bleeding which caused Mr. Countryman's death. There was testimony from a surgical expert at trial that an examination would have revealed the condition; that a simple operation could have been performed within 20 minutes of diagnosis; and that if the surgery had been so performed Richard Countryman would have lived.

■■■ The first issue raised by the county concerns the admissibility of evidence of an extramarital affair by Richard Countryman of which his wife had been aware. During a deposition prior to trial, the county had elicited from Margaret Countryman that sometime during 1980, she had found Mr. Countryman in bed with another woman in his trailer. She had also seen her husband with the woman on a previous occasion when they were starting a car with jumper cables. In addition, the county argued that, from the information made available to it by plaintiff, it appeared that Mr. Countryman had been with the same woman the night he was killed, although there was no evidence of a sexual encounter on that evening. The county sought to introduce this at the trial on the basis that it was relevant to damages because it bore on the value of the consortium Margaret Countryman had lost. A pretrial order *in limine* precluded the county from introducing this evi-

dence.

Margaret Countryman, without conceding the relevance of the evidence, primarily contends that the probative value of the evidence was outweighed by the prejudicial effect it would have had. Therefore, she argues, the evidence was properly excluded. Thus, the following two questions, are presented: (1) was the evidence of Richard Countryman's affair relevant and (2) if so, was the probative value of evidence of that affair outweighed by the unfair prejudicial effect it would have had.

Damages for loss of consortium may be recovered in an Illinois wrongful death action. (*Elliott v. Willis* (1982), 92 Ill. 2d 530, 442 N.E.2d 163.) Consortium consists of several elements, encompassing not only material services but such intangibles as society, guidance, companionship, and sexual relations. (*Elliott v. Willis* (1982), 92 Ill. 2d 530, 535, 442 N.E.2d 163, 165; *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 427, 170 N.E.2d 881, 891; *Coulter v. Renshaw* (1981), 94 Ill. App. 3d 93, 96, 418 N.E.2d 489, 491-92.) Despite the nebulousness of the concept of consortium, a jury is capable of determining its monetary worth. *Elliott v. Willis* (1982), 92 Ill. 2d 530, 539-40, 442 N.E.2d 163, 168.

Since the jury is required to determine the worth of the elements making up the consortium, evidence relevant to that worth is admissible. The narrow question then is whether evidence that Margaret Countryman had found Richard Countryman in bed with another woman had any tendency to establish that the consortium was worth less than if that event had not occurred. (See *Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769 ("[r]elevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable. To be probable, it must be tested in the light of logic, experience and accepted assumptions as to human behavior").) Clearly the evidence at issue did have such a tendency.

In fact, the evidence was relevant on this issue regardless of which side of the relationship is focused upon. First, it had some tendency to establish that Mr. Countryman's affection for his wife and the companionship he was giving her were less than if the incident had never occurred. His indiscretion, in other words, is some evidence that the marriage may not have been an ideal one for him and so some evidence that his contributions to the emotional, intangible aspects of the relationship may not have been of as much value as they might have been without the indiscretion. The evidence thus, depending upon the weight given to it by the trier of fact, could support a finding that the consortium lost was less valuable than it would have been in the ab-

sence of the evidence.

Second, it would be hard to overstate the potential corrosive effect of finding one's spouse in bed with another person on the feelings of the finder. Reaction to it could be so extreme as to completely destroy the marriage or to profoundly change the nature of the relationship because of a severe loss of affection and trust and a deep sense of hurt on the part of the wronged spouse. While such extreme reactions are not inevitable, and it is even possible that such an event would not harm a relationship under some circumstances, there is a sufficient tendency for the event to have such an effect to make it relevant on the question of the value of the consortium lost.

As a California appellate court has said:

"The question of whether extramarital sexual conduct affected the relationship is one of fact to be decided by the trier of fact. Evidence of such conduct is relevant to the nature of the personal relationship and thus as to whether there was any loss of love, companionship, comfort, affection, society, solace, moral support or enjoyment of sexual relations." (*Morales v. Superior Court* (1979), 99 Cal. App. 3d 283, 288, 160 Cal. Rptr. 194, 197.)

Thus, the evidence which the circuit court excluded was relevant to the question of the value of the consortium which Margaret Countryman lost.

During her deposition, Margaret Countryman said that separation or divorce had not been contemplated as a result of the incident. However, she also said, "I always said if he had to have an affair he might as well have it someplace where I wouldn't find him, but it was right across from my daughter's." The former statement was thus some indication that the relationship may not have been too badly harmed by the incident, whereas the latter statement was some indication that Ms. Countryman had been hurt to some degree by the incident. Assuming that the evidence at trial would have been the same, a classic jury question would have been presented requiring a determination of whether the consortium had been harmed and, if so, how much less to award in damages.

The exclusion of this evidence cannot be justified on the ground that its prejudicial effect would have been greater than its probative value. It was highly probative, albeit not conclusive, on the issue of the value of the consortium lost. The event was not remote in time from the death of Richard Countryman, having occurred between 5 and 17 months prior to that death. Also, assuming the county could prove that Mr. Countryman had been with the same woman the night he had his accident, the jury could well have concluded the relationship was con-

tinuing at the time of Mr. Countryman's death. Finally, this was apparently the only strong evidence the county had with which to demonstrate that the consortium lost was of diminished value.

The evidence certainly was not unfairly prejudicial, if it was prejudicial at all. To be sure, it showed Richard Countryman to have been more lacking in fidelity than if he had not had the affair, and it is possible the jury would have decided that the value of the consortium was less and reduced the award of damages accordingly. However, this is not the sort of unfair prejudice against which the rule is aimed, since it is precisely Mr. Countryman's value to his wife as a husband which was at issue. To hold that the prejudicial effect of the evidence outweighed its probative value, this court would be required to conclude that the jury would somehow have been inflamed by the evidence in such a manner that it would award less damages to Margaret Countryman, the individual aggrieved by Mr. Countryman's infidelity and, indeed, the person who comes across most sympathetically in the narrative of the incident. This conclusion cannot be drawn, so the evidence should have been admitted.

■ The county argues that the circuit court erred in refusing to instruct the jury that any award of damages to the plaintiff would be exempt from income taxes. This question has recently been decided by the Illinois Supreme Court which, in a wrongful death case, held that the jury should not be instructed on this subject. *Klawonn v. Mitchell* (1985), 105 Ill. 2d 450, 475 N.E.2d 857.

■ ■ The county also argues that a mistrial should have been granted during jury *voir dire*. This claim is based upon the exposure of jurors to a front-page article in the local newspaper. The article reported that the trial judge, acting in his capacity as chief judge, had appeared before a committee of the county board and had said the safety of jailers and inmates at the Winnebago County jail was threatened due to understaffing. The judge's remarks were based upon a grand jury's recommendations after inspecting the facility.

To have been entitled to a mistrial, the county was required to demonstrate actual prejudice as a result of an occurrence of such magnitude and character that the county was deprived of a fair trial. (*Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913, 410 N.E.2d 249, 251.) To do this, the county had to show that one or more of the jurors was influenced or prejudiced to the extent that they were no longer fair and impartial. (*Williams v. Board of Education* (1977), 52 Ill. App. 3d 328, 335, 367 N.E.2d 549, 594.) On appeal, the standard by which the trial court's order is judged is even stricter. The ruling on the mistrial motion will not be disturbed absent a clear abuse of discretion.

*Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913, 410 N.E.2d 249, 251.

When the newspaper article was brought to the trial judge's attention, he took steps to insure that the jurors were fair and impartial. The sworn and prospective jurors were asked as a group whether they had looked at the newspaper at all. Those who had were questioned individually and out of the presence of other jurors to determine whether they had seen the article in question, how carefully they had attended to the article if they saw it, and what effect the article would have on their impartiality. All of the jurors who had seen the article stated that they would not be influenced by the article and that they felt they could be fair despite having seen the article. While it would have been better if the trial judge's remarks about the jail had not appeared in the newspaper during the pendency of this lawsuit, the judge cannot be faulted for the steps he took to insure an impartial jury after these remarks were published. The answers the jurors gave when questioned about the article demonstrate no actual prejudice to the county as a result of the article. Consequently, the trial court's denial of the mistrial motion was proper.

■■ ■ The county argues that the judgment was contrary to the manifest weight of the evidence. The county's position is that it did not breach any duty it owed to Richard Countryman and that, even if it had, that breach did not proximately cause Mr. Countryman's death. This argument is unpersuasive.

The county owed a duty of care to Richard Countryman. Its duty was to "exercise ordinary and reasonable care for the preservation of their prisoner's health and life under the circumstances of the particular case." (*Delasky v. Village of Hinsdale* (1982), 109 Ill. App. 3d 976, 980, 441 N.E.2d 367, 370.) There was evidence from which the jury could have concluded that the county breached this duty.

County jail employees were aware that Richard Countryman had been involved in a vehicular accident in which somebody had been injured. A jail employee had also heard Mr. Countryman complain of pain on three separate occasions, on two of which he saw Mr. Countryman's midsection jerk. The jury could also have concluded that one or more of the jail's employees knew that Mr. Countryman had fallen in the jail, struck his head against a wall, and caused an indentation or hole in the wall. Finally, there was evidence that a medical questionnaire was started but not completed when Mr. Countryman was being booked that night. This evidence was sufficient, if the jury chose to so conclude, to support the conclusion that the jail violated both its own regulations and State statutes by not having the medical form (including a question about whether Mr. Countryman was suffering any pain)

completed and by not having Mr. Countryman seen by medical personnel. It is in these ways that the jury could have concluded the county breached its duty, and not in failing to specifically diagnose Richard Countryman's torn mesentery. This was sufficient to support a finding that the county breached its duty of care.

Proximate cause was also sufficiently established by the evidence. There was testimony by an expert in abdominal surgery that if Richard Countryman had been brought to the hospital the morning of his death an examination would have been performed diagnosing the torn mesentery and, within 20 minutes of diagnosis, a relatively simple operation which could have saved his life could have been started. It is true, as the county points out, that the torn mesentery was the result of the vehicular accident, which may have been Mr. Countryman's fault and certainly was not the county's fault. However, it is also true that there can be more than one proximate cause of an injury (*Bentley v. Saunemin Township* (1980), 83 Ill. 2d 10, 17, 413 N.E.2d 1242, 1246) and, as explained earlier, the county's failure to have Richard Countryman seen by medical personnel was a proximate cause of his death.

■ One final point with respect to the county's sufficiency of the evidence issue remains to be made. The county has, in its argument, complained that certain evidence should have been admitted, and, if it had been, the county contends it would have prevailed either on its motions for a directed verdict or when the jury returned its verdict. Since these have not been raised as separate issues and since, moreover, no authority has been cited on the evidentiary points made, they may be considered waived.

The county has made two additional arguments. The first is that the circuit court erred in permitting the jail's physician to be cross-examined regarding allegations contained in pleadings filed in a Federal lawsuit by a former inmate of the jail and that this error was compounded by the court's refusal to permit the "impeachment" of the non-testifying Federal litigant by use of a criminal conviction. The second is that the county should have been permitted to elicit testimony from the county coroner that, based on national studies, a person who abuses alcohol has a 15 times greater chance of death by accident than a person who does not. No authority whatsoever has been cited by the county in support of the first of these arguments. In the second argument, the county has cited a case pertinent only to the question of whether the county's offer of proof was conducted properly, and nothing with respect to the central question of whether the testimony was admissible. The failure of the county to cite any authority pertinent to its contentions has waived these issues. 87 Ill. 2d R. 341(e); *Fuller v.*

*Justice* (1983), 117 Ill. App. 3d 933, 942-43, 453 N.E.2d 1133, 1139; *Moretti v. Department of Labor* (1983), 119 Ill. App. 3d 740, 747, 457 N.E.2d 114, 118; *Wilson v. Continental Body Corp.* (1981), 93 Ill. App. 3d 966, 969, 418 N.E.2d 56, 58.

▋ The plaintiff on cross-appeal argues that the jury should not have been instructed that an intoxicated person is held to the same standard of care as a sober person. (Illinois Pattern Jury Instruction, Civil, No. 12.01 (2d ed. 1971).) The contention is that this court should hold, as a matter of law, that Mr. Countryman was incapable of exercising any care for his own safety due to his deteriorating condition as a result of his injuries, his intoxication, and the strangeness of his surroundings. The plaintiff seeks a $200,000 additur, since that would negate the jury's 50% reduction of the award to account for Mr. Countryman's contributory negligence.

The evidence was such that, if the plaintiff asked for it, the jury could properly have been instructed to decide the threshold question of whether Mr. Countryman had the capacity to exercise any care for his own safety. (*Dezort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, 711, 342 N.E.2d 468, 474-75.) However, the evidence—including his being able to talk and to respond to questioning and his refusing to bond out or to telephone anyone from the jail—would permit an inference that Mr. Countryman had the capacity to exercise some care for his own safety. In short, this question cannot be decided as a matter of law, and the plaintiff waived the right to a jury determination of it by failing to tender an instruction on it. 87 Ill. 2d R. 366(b)(2)(i).

It is also noteworthy that, since the issue of contributory negligence was properly before the jury, the instruction complained of is a correct statement of the law applicable to this case. It properly informed the jury that an intoxicated person is held to the same standard of care as a sober person. (*Dezort v. Village of Hinsdale* (1979), 77 Ill. App. 3d 775, 778, 396 N.E.2d 855, 858.) The giving of this instruction was therefore not erroneous.

The judgment of the circuit court of Winnebago County is affirmed as to liability; reversed as to damages; and the cause is remanded for a retrial on damages only.

Affirmed in part; reversed in part; and remanded.

STROUSE and HOPF, JJ., concur.