DONALD JOHANEK *et al.*, Plaintiffs-Appellees, v. RINGSBY TRUCK LINES, INC., *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 86—238

Opinion filed June 3, 1987.

McKenna, Storer, Rowe, White & Farrug, of Chicago (James P. DeNardo, Lyndon C. Molzahn, and Shaun McParland, of counsel), for appellants.

Drumke & Patterson, Ltd., of Chicago (Ronald A. Drumke and Robert B. Patterson, of counsel), for appellees.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff Donald Johanek sought damages from defendants Ringsby Truck Lines, Inc., and Hobbs Trailers, a division of Fruehauf Corporation, for personal injuries suffered when the trailer brakes on his tractor-trailer unit failed and the vehicle crashed into a canyon wall in Utah. Johanek's wife, Ardice, sought damages for loss of consortium. A jury returned a verdict of $1,320,000 for Johanek and a verdict of $880,000 for Ardice. The jury found Ringsby 22% negligent and Fruehauf 78% negligent and reduced the awards by 10% for negligence attributable to Johanek. Judgment was entered on the verdicts, and Fruehauf appeals. Ringsby is not a party to the appeal.

On appeal, Fruehauf contends that the trial court erred in not granting its motion for judgment notwithstanding the verdict for Johanek; that both verdicts were unsupported by the evidence; that the damages awarded Johanek were against the manifest weight of the evidence; that Johanek's negligence was the sole proximate cause of the accident and a new trial on the issue of comparative fault is required; and that numerous reversible errors occurred which denied Fruehauf a fair trial on all issues. Fruehauf also attacks the loss of consortium award, contending that the trial court should have entered a judgment notwithstanding the verdict or a directed verdict; that no reasonable basis for computation of the consortium award existed; that the award was against the manifest weight of the evidence; that the award was the result of a misstatement of the law by plaintiffs' counsel during closing argument; and that the award was grossly excessive, thus entitling Fruehauf to either a new trial on this issue or a substantial remittitur of the consortium award.

On October 28, 1979, Johanek, an interstate truck driver, was driving through Utah hauling a trailer for Ringsby. Hobbs had recently serviced the trailer brake system for Ringsby. The trailer brakes allegedly failed and Johanek lost steering control, crashing

into the side of a canyon wall. Johanek suffered multiple injuries, including the amputation of his right leg.

On October 18, 1979, Johanek picked up a 45-foot Ringsby trailer weighing 9,000 pounds in Kansas City, Kansas, with directions from Ringsby to proceed to Des Moines, Iowa, pick up a load of tires, deliver it to Los Angeles, and bring a return load to Michigan. Shortly after leaving Kansas City, Johanek noticed a little smoke coming from the two left wheels of the trailer. He also noticed that the trailer was "holding back" on him and that the "brakes weren't very good."

Johanek advised Ringsby of the trailer brake problem. The dispatcher told him to stop at a Fruehauf brake facility in Des Moines after picking up the load. The smoking stopped before Johanek reached Des Moines. The Fruehauf dealer in Des Moines was closed, and Johanek was told by the dispatcher to proceed to a dealer in Omaha, Nebraska. The dealer was also closed. The brakes were still holding back. Johanek went to a truck stop in Omaha, but the employees did not know how to repair the trailer's self-adjusting brakes.

Johanek stopped at a Tomahawk Truck Stop near Denver on Saturday, October 20, 1979. He told the Tomahawk mechanic that there was insufficient braking power on the trailer. After several hours, the mechanic advised Johanek that a relay valve on the trailer brake system had been cleaned, but that a new relay valve was needed. The mechanic also told Johanek that one or more of the wheels were not locking up properly, but that they would be probably locked up by the time he arrived at the mountains. Johanek arrived in Los Angeles on October 22 and remained there for three days. He delivered the tires and picked up a 45,542-pound load of cosmetic products. Johanek drove to Las Vegas, where he stayed for one day.

On Sunday, October 28, Johanek drove on flat roads until he reached a 25-mile stretch of two-lane mountainous highway in Utah. On the seven-mile upgrade, Johanek used third gear and travelled at 15 to 18 miles per hour. At the crest of the hill, a sign recommended a speed of 35 miles per hour on the downgrade. The 2½ mile downgrade had numerous curves, with two sharp "S" turns at the bottom of the hill. Johanek shifted into fourth gear and drove at 20 to 26 miles per hour. About one mile down, he shifted into fifth gear, which has a range of 26 to 32 miles per hour. Johanek initially was accelerating as he went down the hill.

At this point, Johanek tested the hand valve which controlled the trailer brakes, but not the tractor brakes. Originally Johanek set the hand valve for five to seven pounds of air to check his braking power and control his speed. He felt little brake response and increased the

setting to 10 pounds, then to 15 pounds, and finally he opened the valve completely to 120 pounds of air. He felt no more braking force than he had felt using six pounds of air. Johanek began pumping the brake pedal in the tractor, which simultaneously controlled both the tractor and the trailer brakes. The trailer was starting to override the tractor. He touched the brake pedal lightly, which slowed him down momentarily. He did not attempt to downshift.

Johanek drove through the first "S" curve at a speed of about 35 miles per hour, crossing the center line. He continued pumping his tractor brakes, and finally floored the tractor brake. He had not done this previously because of the danger of a jackknife. He turned the steering wheel to the right in an attempt to negotiate the second "S" curve, but had no response. The truck then crashed into the canyon wall on the left side of the road.

Johanek testified that during the entire cross-country trip he never used the trailer brakes alone to completely stop the truck, except once when he entered Utah. Otherwise, he only used the trailer brakes alone momentarily to control speed and test his braking power. He would generally use six pounds of air. Johanek stated that it was a bad practice to use only the trailer brakes for completely stopping the unit.

Wayne C. Harris, Ringsby's director of safety, testified for plaintiffs regarding the history of the trailer Johanek was hauling at the time of the accident. Ringsby had owned the trailer since 1973, and used it until 1976, when Ringsby's drivers went on strike. The trailer was stored in an open lot in Wyoming until the strike ended in 1979. The service records for the trailer were lost or destroyed, and thus the number of miles the trailer had traveled in its three years of use, or when the brakes were serviced during those three years, was not known.

In October 1979, the trailer was taken to Colorado for servicing at the Hobbs Trailers garage. Records reveal that Ringsby asked Hobbs to "check and repair the complete brake system." The trailer left the Hobbs garage on October 8, 1979. A driver took it to St. Louis carrying a load of tea. It is unknown how the trailer arrived in Kansas City, where Johanek picked it up.

James Cummings, an engineer for Rockwell Company, testified for plaintiffs regarding the manner in which the Rockwell brakes function. Johanek drove a 15,000-pound tractor which was 18 months old. The brake system consisted of a brake pedal which controlled both the trailer and tractor brakes; a hand valve which controlled the trailer brakes separately; and a 13-speed transmission, one gear for

reverse and 12 gears for going forward. The trailer brakes could be used alone to bypass the tractor brakes. It would not be proper to completely stop a truck by using the hand valve, which only turns the brakes on the trailer. The foot pedal, which coordinates the tractor and trailer brakes, should be used.

Each Rockwell trailer brake consists of a brake drum, two brake shoes and two actuator mechanisms. Each actuator mechanism consists of a wedge, roller assemblies and two plungers. When the brake is applied, the wedge pushes forward in the actuator mechanism and causes the brake shoes to expand outwardly into the drum. This creates a force between the brake lining and the drum and that friction stops the vehicle. As the linings wear down, a self-adjusting mechanism compensates for the wear. The inside of the trailer wheels have metal dust covers with two peepholes for observing the brake shoe wear. The internal wedges, internal self-adjustors and the majority portion of the brake shoe are not visible from the outside of the wheel.

Cummings testified that he examined the Johanek trailer brakes. Three of the four brakes each had at least one actuator which was not working. The dirt and corrosion on the brakes indicated that they had not been taken apart in years. After viewing a photograph of the internal part of the brake on the left rear wheel, Cummings testified that the brake was inoperable. Part of the self-adjusting mechanism was cross-threaded, which could not have been the result of the accident and had to occur when somebody put the parts together. If the system had been taken apart for a complete check and repair, a mechanic definitely would have noticed the cross-threading which jammed the self-adjusting mechanism.

Cummings also observed the brake shoes on the Johanek trailer. The two rear wheels had virtually no wear on the shoes, and the shoes had never touched the drums in places. Even if the shoes had only been on for five weeks, they would have shown a great deal of wear if the brakes had been operating properly. The left front brake shoe was destroyed by fire. Cummings testified that severe heat damage to the brake shoe on the left front wheel of a trailer would indicate it was overloading because the brakes on the other three trailer wheels were not supplying adequate power. The shoes on the right front wheel were in reasonable condition.

Cummings testified that performance tests showed that where one of the two wedges on Rockwell double wedge brakes had been disconnected, the result was a 50% loss of braking power on the wheel, if the rest of the braking system was in perfect condition. If

there were other problems in the brake system, such as worn brake shoes, a jammed self-adjuster, or oversized drums, there could be a braking power loss of up to 100% on each wheel.

Cummings also testified that it was impossible for a mechanic who had no experience with Rockwell double wedge brakes to check and repair the brake system without using the Rockwell Field Maintenance Manual. That manual indicates that the internal brake system mechanisms should be taken apart completely to check internal conditions, either at 100,000 miles or once annually or at each brake reline. This would be necessary even if the trailer had been idling on a lot for three years because the grease hardens or leaks and corrosion sets into the brake system. It takes about 16 hours to check and repair the Rockwell brake system, which requires disassembling the system. In Cummings' opinion, a direction to "check and repair" a complete brake system should mandate a complete disassembly of the system.

After examining the brake system on the Johanek trailer, Frederick E. Arndt, a mechanical engineer and an expert in motor vehicle accident reconstruction, testified for plaintiffs and offered some conclusions. Arndt concluded that the high degree of deterioration was the result of poor long-term maintenance. Because it is a balanced system, all four wheels should deliver equal braking power, each delivering 25% of the trailer's total braking power. The right front wheel could have been supplying about 25% of the braking force. The three remaining wheels had lost all of their braking power. Thus, the trailer had only 25% of its braking capacity functioning. Arndt concluded that the accident occurred because of a loss of steering control due to the trailer's tending to overrun the tractor, a condition which was caused by the insufficient braking power available to the trailer brakes. Arndt opined that if Hobbs had properly performed even a minor preventative maintenance inspection, all of the problems in the brake system would have been discovered. A mechanic viewing the clearance between the drum and shoe should have observed that it was twice what the manufacturer recommended, which should have indicated that the adjustors were not functioning properly, that the drums were too large, or that some other mechanical problems existed. At that point, the mechanic should have removed the dust covers to locate the problem.

Arndt also concluded from his reconstruction of the accident that the truck was traveling at 25 to 30 miles per hour when the accident occurred. Arndt testified that driving down a hill with a grade of 2.4 and a load of 68,000 pounds using only the trailer brakes is not advisable. In determining the extent to which you need trailer brakes,

there is a distinction, however, between an emergency situation, where a driver wants to make a complete stop quickly, and a situation where you are traveling at 25 miles per hour and merely want to maintain speed. Although it is desirable to downshift, Arndt believed that there is room for a judgment call by the driver, depending upon the circumstances present at the time. Johanek's downshifting may have given additional braking power or helped him maintain control. It also might have added to the instability of the truck. There is a wide range of variables and the driver is in the best position to judge. Arndt noted that Johanek had considered downshifting but chose not to do so because he was afraid he would not be able to make the gears shift. Arndt testified further that in viewing the tire marks on the road at the accident site, the outer tire marks were the tractor tire marks. The inner marks were slide marks from the trailer.

Lester Hendrickson, a metallurgist, testified for plaintiffs that an analysis of the time sequence revealed that the right rear brake's actuator parts had been partially fractured before the accident and could have been discovered if the mechanism had been taken apart. Hendrickson testified that some braking power remained, although the brakes would not have functioned normally when the trailer left Hobbs. The final breakdown of the actuator parts on this wheel occurred just before the accident, thus leaving that wheel with no effective braking power at the time of the accident. The fracture could not have been the result of the accident.

Donald Taylor, a mechanic, testified for plaintiffs that he inspected the trailer brake system following the accident. While Taylor determined that the trailer brake mechanism was faulty, he did not disassemble the internal brake system. He also inspected the tractor brakes and found 90% of the brake linings remained on all brakes. The tractor brakes were well-lubricated and all areas appeared normal.

Edwin McBroom, a Hobbs shop foreman, testified for plaintiffs that "although check and repair of the complete brake system" was listed on the work order, the final bill showed no time charged for that service. The shoes on the right rear wheel were relined by Hobbs. A minor preventative maintenance inspection was done, but it did not involve pulling off the wheels, and reference to a service manual was not necessary. The minor inspection merely involved checking for shoe wear and brake workability.

McBroom testified that he had no formal training for servicing Rockwell double wedge brakes and had never read the Rockwell manual or any other literature regarding these brakes. As a part of the

task of checking and repairing a completed brake system, the wheels would not be pulled from the trailer, and the inner mechanisms would not be disassembled. McBroom testified that although it was good practice to have the maintenance history of a trailer, it was typically not provided to Hobbs. The records showed that the right rear wheel had 25% lining remaining and that the other three wheels had 90% lining remaining.

Jeffrey Ewals, a Hobbs mechanic, testified for plaintiffs that on September 20, 1979, he spent 2½ hours doing a minor inspection on the brakes. This included looking through peepholes in the dustcovers on the wheels to check the brake lining. It did not include removing the covers or wheels and disassembling the brake systems. Ewals had no formal training regarding this type of brakes and had never read a manual. He had some on-the-job training, had completely taken apart two Rockwell double wedge brake mechanisms, and had generally serviced 5 or 10 double wedge brakes. In Ewals' opinion, a trailer which had been in an open yard for three years should have its brake system disassembled and checked before being returned to service.

Ewals testified that in 1979 it was standard practice at Hobbs not to remove the dust shields. Instead, the mechanic merely looked through the peepholes in the dust shields. This was contrary to Fruehauf's written instructions. In looking through the peepholes on the Johanek trailer, Ewals noticed that 75% of the lining was worn down on the right rear wheel of the trailer. Two other employees, Phillip Herbert and James Hagle, relined that brake.

Herbert and Hagle testified that they worked on the trailer. Neither had previously worked on this type of brake, and neither had any training for servicing Rockwell brakes. Hagle was not qualified to disassemble such a brake.

Robert V. Mathers, a Rockwell engineer, testified for Fruehauf that a double wedge brake which has one actuator not functioning will operate as a single wedge brake, which Rockwell also manufactures. Both shoes on the brake would still expand, and both would make contact with the brake drum. The brake would still be functional. Mathers stated, however, that Rockwell does not sell or recommend a single wedge brake for a trailer the size of Johanek's.

Mathers knew of no Rockwell tests of a double wedge brake with one actuator not functioning. He stated that Cummings, who Mathers said was very knowledgable about Rockwell brakes, might have run or observed such tests. Using Rockwell test data and other specific data regarding the Johanek brakes, Mathers made calculations of the brake capacity which would remain on the brakes of a trailer on which three

of the wheels had one wedge nonoperable and the fourth wheel had both wedges operative. Mathers used hypotheticals, from which he concluded that the vehicle retained between 91.5% and 94% of its braking power. The hypotheticals assumed the typical situation where the tractor brakes provide 60% of the vehicle's braking power. Mathers had no opinion of the loss of braking power on the Johanek trailer itself.

In regard to Cummings' testimony, Mathers stated that he agreed with some parts and disagreed with others. For example, he disagreed that a double wedge brake with one wedge nonfunctional then had only 50% pressure put on the brake to stop wheels from spinning. Mathers testified further that according to the Rockwell manual, which is available to all customers, if a trailer had been out of service for three years and no maintenance history was available, a major inspection should be done.

Larry Brown, a Utah Highway Patrol trooper, testified that he studied the tire marks at the scene on the day of the crash. The outer tire marks led to the tractor wheels and had to come from the tractor wheels. The inner tire marks had to come from the trailer wheels. The inner tire mark stopped at a point nine feet six inches behind where the tractor wheels came to rest. When Brown arrived at the scene, the left rear wheel was smoking.

Carl Uzgiris, an accident reconstruction expert and a mechanical engineer, testified for defendant Ringsby. He agreed with Arndt that if Hobbs had properly performed a minor preventative maintenance inspection in September 1979, all of the problems with the brake system would have been discovered and should have been corrected. The term "check and repair complete brake system" meant something more than a minor check.

Uzgiris examined the Johanek trailer brakes. He believed that the vehicle should not have been in use without proper repairs having been completed. He believed, however, that the damaged parts did not diminish the braking power or control of the vehicle to the extent that it caused the accident. If Johanek were driving at a low speed down a 2.4 grade, braking was not necessary and thus the braking ability was immaterial. Uzgiris estimated that 50% of the trailer's braking capacity was absent. If there was 50% loss of braking power on three of the wheels and only a 30% loss on the other wheel, there would be an imbalance between the braking power of the tractor and that of the trailer. And if the tractor brakes were locked up while such an imbalance existed, the truck would jackknife.

Uzgiris also testified as to his reconstruction of the accident. He

concluded from an analysis of the wheel marks that the truck traveled at a high speed. He believed the outside tire mark was from the trailer, and the inside tire mark was from the tractor, which indicated the truck was traveling fast when it crashed. The outside tire mark which extended nine feet six inches beyond the inside tire mark could not have been made by the trailer. Uzgiris stated that it is a bad practice to use trailer brakes alone to control speed. Even if the gear handle in the tractor was in the fifth gear position, it might not prove that the transmission was in fifth gear. If the range selector was set in the high range, the gear handle would be in the fifth gear position, but the transmission could be in tenth or eleventh gear, which would allow the truck to travel at approximately 50 miles per hour.

George Alan Hagelthorn, a former Hobbs engineer, testified for Fruehauf that it was reasonable to perform a minor preventative maintenance inspection on a trailer that had been in an open lot for three years. The absence of maintenance records was typical and not important. It was permissible to perform a minor inspection without removing the dust shields. Hagelthorn believed that the Hobbs mechanics performed their work on the Johanek trailer properly and within the general guidelines of mechanics with the Fruehauf organization. Hagelthorn agreed that without removing the dust shields, it was not possible to tell whether both wedges were working on a particular wheel.

Hagelthorn testified that after the accident he examined the disassembled brake system on the Johanek trailer. He gave detailed testimony as to his examination of each wheel, but his testimony may be summarized. Hagelthorn believed the drums and shoes were all making contact at the time of the inspection. The shoes and linings could be functioning 50% or 60% effectively and the vehicle would still have 100% effective brakes. If the vehicle was being handled properly, the trailer had sufficient brake capacity to control the truck's speed prior to the accident. Hagelthorn agreed that imbalance of the brakes existed on this trailer, but stated that imbalance was not an unacceptable condition. A report written by Hagelthorn, however, stated that imbalance definitely is not acceptable and can cause severe control problems. Hagelthorn agreed that the rusty or corroded parts were in that condition to some degree at the time Hobbs serviced the trailer. As manager of reliability at Hobbs, he would not have recommended that the trailer be put on the road if he had known the brake system was in such condition.

Theodore Fritz, a Hobbs mechanic, testified for Fruehauf that he typically performed a road check on a trailer before returning it to a

customer. Fritz did not recall if he had performed such a check on the Johanek trailer, but stated that if he had tested it, the test would have been performed on flat ground and the trailer would have been empty.

Defendant Fruehauf contends that the trial court erred in failing to grant its motion for a judgment notwithstanding the verdict because its subsidiary's servicing of the brakes was not the proximate cause of the accident. Verdicts ought to be directed and a judgment notwithstanding the verdict entered only when all of the evidence, viewed in a light most favorable to the opposing party, so overwhelmingly favors movant that no contrary verdict based on that evidence could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) In order to establish proximate cause, plaintiff must demonstrate with reasonable certainty that defendant's negligent acts caused his injuries. (*Murphy v. Chestnut Mountain Lodge, Inc.* (1984), 124 Ill. App. 3d 508, 464 N.E.2d 818.) A question of proximate cause is an issue to be decided by a jury. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9.) The issue of proximate cause can only become a question of law where the facts are undisputed and there can be no difference in the judgment of reasonable persons as to inferences to be drawn from those facts. (*Thomas v. Northington* (1985), 134 Ill. App. 3d 141, 479 N.E.2d 976.) Under the comparative negligence doctrine, the jury is not required to find only one proximate cause. (*Dodson v. Shaw* (1983), 113 Ill. App. 3d 1063, 448 N.E.2d 188.) The judgment *n.o.v.* standard is not altered in the comparative negligence context. *Ashby v. Price* (1983), 112 Ill. App. 3d 114, 445 N.E.2d 438.

The testimony, of course, was conflicting. Yet there was ample, indeed overwhelming, evidence for the jury to find that the negligent servicing and inspection of the trailer by employees of Fruehauf's subsidiary, Hobbs, failed to reveal the extensive defects in the brakes which ultimately were the proximate cause of the accident. And Arndt so concluded. While Uzgiris testified that the accident was caused by speeding and had nothing to do with the brakes, the majority of the evidence pointed to problems in the brakes as a proximate cause of the crash. Arndt also testified that the Hobbs inspection was conducted improperly and that even a minor inspection should have revealed the serious defects in the brake system. Cummings testified that a Rockwell brake system cannot be serviced properly without using the Rockwell manual. Yet the Hobbs' employees had not seen a copy of the manual and had little or no experience or training with the Rockwell brakes. All the witnesses agreed that for a proper in-

spection it was necessary to remove the dust covers from the wheels, but the Hobbs' employees testified that this was not the practice at Hobbs. The trial court properly denied Fruehauf's motion for judgment *n.o.v.*

■ Fruehauf also contends that Johanek's failure to downshift and use his tractor brakes was the proximate cause of the accident and that the jury's allocation of 10% of the fault to Johanek was against the manifest weight of the evidence. Several witnesses testified that it was unsafe to use the trailer brakes alone. These witnesses, however, were generally referring to a situation where the driver was halting the vehicle completely, not merely controlling speed. When Johanek realized his trailer brakes were not operating, he used his tractor brakes to try to control speed. He avoided fully applying the tractor brakes in an attempt to avoid jackknifing. Uzgiris admitted that an imbalance in braking power and full use of the tractor brakes could result in a jackknife, and Arndt testified the downshifting could increase the instability of the truck. Arndt also testified that this decision involved many variables and the use of the trailer brakes or downshifting to control speed was a judgment call which the driver was in the best position to make. Thus, it is not clear, as a matter of law, that Johanek's actions were the sole proximate cause of the accident, or that the 10% negligence attributed to Johanek was against the manifest weight of the evidence.

■ Fruehauf also complains of several errors which occurred during the trial. It contends that the trial court erred in denying Fruehauf's motion *in limine* concerning the fact that a Hobbs mechanic inverted the right rear brake shoe. Whether evidence is relevant, and thus admissible, depends on whether it tends to prove an issue in the case. (See *People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 139 N.E.2d 780.) The competency of the Hobbs employees was a major issue in the case, and thus testimony regarding an error made on the minimal work which they actually performed on the brakes was admissible. Similarly, testimony by Hobbs employees regarding their familiarity and knowledge of the Rockwell brakes was relevant and properly admitted into evidence.

■ Fruehauf also argues that the trial court erred in excluding records and testimony regarding certain Rockwell tests comparing double and single wedge brakes. In February 1985, plaintiffs served a notice pursuant to Supreme Court Rule 220 requesting Fruehauf to identify additional expert witnesses. (103 Ill. 2d R. 220.) A response was filed in April 1985 identifying only one additional expert witness, who never testified. On September 17, 1985, Fruehauf notified plain-

tiffs that it was deposing Mathers on September 27, the Friday before trial began. The determination of the appropriate sanction for failure to comply with a discovery order lies within the discretion of the trial court. (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 483 N.E.2d 711.) Rule 219(c)(iv) permits the trial court to bar a witness from testifying concerning the issue related to a party's failure to comply with Rule 220. (103 Ill. 2d R. 219(c)(iv).) The trial court did not abuse its discretion in excluding testimony and written test results related to the Rockwell tests but properly permitted Mathers to testify to his general conclusions which were based upon those test results.

■ Fruehauf further contends that the trial court erred in allowing Ringsby to question Johanek regarding a statement made by a Ringsby employee when Johanek telephoned him during the trip. Fruehauf complains that Ringsby's counsel stated he would use the employee's evidence deposition to substantiate the conversation, but never offered it into evidence. The record shows, however, that Fruehauf stipulated that the deposition would not be read into evidence. No error was committed.

■ Fruehauf maintains that the trial court made several errors relating to jury instructions. The trial court gave an Illinois Pattern Jury Instruction regarding proximate cause which included the statement, "It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." (Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971) (hereinafter IPI Civil 2d).) This language is proper where there is evidence that something other than the negligence of the parties was a proximate cause of the injury. (IPI Civil 2d No. 15.01, comment at 93; *Heitz v. Hogan* (1985), 134 Ill. App. 3d 352, 480 N.E.2d 185.) There was testimony that some of the brake system's defects were due to design or installation problems. The instruction was proper.

■ The trial court refused to give Fruehauf's instruction which stated: "However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." (IPI Civil 2d No. 12.04.) The IPI notes indicate that this paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person. As we have noted, there was some evidence pointing to the negligence of a third person, but there clearly was not evidence tending to show that a third person's conduct was the sole proximate cause of the injuries. This instruction was properly refused. We further find unpersuasive Fruehauf's argument that the issue instruction given by the

trial court was improper.

■■ We next address Fruehauf's claim that the jury verdict of $1,320,000 for Johanek, reduced by 10% to $1,188,000 for negligence attributable to him, was excessive. The test to be used when examining a verdict challenged as being excessive is whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.) A reasonable balance should be made between the amount of damages and the extent of the injuries, and there is no precise rule by which an award of damages can be fixed in a personal injury action because such compensation does not lend itself to mathematical computation. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.) The amount of a verdict is generally a factual question for the discretion of the jury. *Clark v. City of Chicago* (1980), 88 Ill. App. 3d 760, 410 N.E.2d 1025; *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354.

■■ Evidence established that Johanek's actual monetary damages included medical expenses of $28,000; future medical expenses of $25,000; and past and future loss of earnings of $551,000. Medical evidence established that Johanek suffered fractures of both legs and eventually the amputation of the right leg; a fractured clavicle which left him disfigured and impaired the function of his shoulders; a torn medial collateral ligament of the left knee, which will have to be replaced in the future; respiratory problems; and traumatic arthritis. Many of the conditions will worsen, and none of the conditions are expected to improve. Johanek has been hospitalized numerous times for long periods and still suffers from pain and complications of the injuries.

Before the accident, Johanek enjoyed such activities as dancing, fishing, camping, hunting, going to movies, and working around the house. He can no longer engage in these activities. He has not worked since the accident and has been unable to find employment. He can only stand for five minutes at a time and can only walk a few blocks at a time. While he can drive a car, he can no longer drive a truck.

The evidence amply supports the amount of the verdict for Johanek. The award is not excessive as to shock the judicial conscience and we cannot say the size of the verdict is the result of prejudice or passion on the part of the jury. We refrain from substituting our judgment for that of the jury on this factual question. The verdict for Johanek, therefore, will not be reduced or set aside.

Fruehauf contends further that the trial court erred in failing to enter a directed verdict or judgment notwithstanding the verdict regarding plaintiff Ardice Johanek's loss of consortium claim.

Initially we note that Ardice has dropped any claim of impaired sexual relations. She testified that she married Johanek in 1955. Johanek can perform no household services. They cannot participate in activities in which they previously engaged, including camping, hunting, fishing, and going to movies. Ardice has to apply medicine to the stump, where Johanek develops ulcers every month or two, and bring him things when he cannot use his artificial leg during those times. They can no longer go dancing, as they formerly did. Although he tried dancing one time, Johanek lost his balance. Johanek is depressed and ornery. They still go out to dinner occasionally. Ardice worked part time both prior to and after the accident.

Consortium includes more than material services. It also includes elements of guidance, companionship, felicity, and sexual relations, all welded into conceptualistic unity. *Brown v. Metzger* (1984), 104 Ill. 2d 30, 470 N.E.2d 302; *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 170 N.E.2d 881; *Countryman v. County of Winnebago* (1985), 135 Ill. App. 3d 384, 481 N.E.2d 1255.

While Ardice has dropped any claim of impaired sexual relations, in regard to the other elements, the testimony of both plaintiffs and the medical evidence support a judgment for loss of consortium. The evidence established that prior to the accident, Johanek was an active man. He engaged in numerous sporting and entertainment activities. He is now sedentary, often in pain, and has trouble performing even simple household tasks. (See *Manders v. Pulice* (1970), 44 Ill. 2d 511, 256 N.E.2d 330.) This, along with the medical evidence, supports Ardice's testimony that Johanek is often depressed and ornery. Furthermore, she has been deprived of his companionship during his frequent and lengthy hospitalizations. Furthermore, we find no merit in Fruehauf's contention that double recovery occurred here. (See *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 170 N.E.2d 881.) We also find that by failing to object, Fruehauf waived the issue of the possible impropriety of a remark made by plaintiffs' counsel in closing argument that Ardice needed to "take care of him when he can't use his leg and when the sores develop on that stump."

We agree, however, with Fruehauf's contention that the award for loss of consortium in the amount of $880,000 is excessive. We find that the award exceeds fair and reasonable compensation and is so large as to shock the judicial conscience. (See *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343

N.E.2d 65.) While the determination of an award of damages is peculiarly within the province of the trier of fact, the appellate court has the power to review an excessive verdict. (*Hedrich v. Borden Co.* (1968), 100 Ill. App. 2d 237, 241 N.E.2d 546.) An excessive verdict should be corrected in the trial court by remittitur or a new trial. Failure of the court to do so is error and the appellate court should correct that error. (*Hedrich v. Borden Co.* (1968), 100 Ill. App.2d 237, 241 N.E.2d 546.) While the loss of consortium is difficult to measure in monetary terms, recovery should be directed by reason and justice.

After considering all of the evidence most favorably to Ardice Johanek, we find the judgment in the amount of $880,000 for loss of consortium under these circumstances to be highly speculative and not supported by substantial evidence. We therefore conclude that the award is excessive. We hold that plaintiff Ardice Johanek is entitled to recover a sum not exceeding $500,000. If she enters a remittitur of $380,000 within 30 days, the judgment for the remaining $500,000 is affirmed. Otherwise, the cause will be remanded for a new trial solely on the issue of damages on loss of consortium.

■■■ We finally consider Fruehauf's challenge to the trial court's giving of instructions regarding loss of consortium, which included the elements of loss of the husband's services, society, and companionship. As we have stated, there was sufficient evidence to support an award for loss of consortium. Thus, these instructions were properly given.

For the foregoing reasons, the judgment of the circuit court of Cook County as to Donald Johanek is affirmed; the judgment as to Ardice Johanek is affirmed as modified upon entry of a remittitur.

Affirmed in part; affirmed in part as modified.

RIZZI and WHITE, JJ., concur.